INDEPENDENT SCHOOL DISTRICT
NO. 12, CENTENNIAL, Relator,

v.

MINNESOTA DEPARTMENT OF
EDUCATION, Respondent.

No. A08–1600.

Court of Appeals of Minnesota.

June 23, 2009.

Paul C. Ratwik, Nancy E. Blumstein, Erin E. Ische, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for relator.

Lori Swanson, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by STAUBER, Presiding Judge; MINGE, Judge; and LARKIN, Judge.

## OPINION

MINGE, Judge.

This case involves a fifth-grader, her parents, the administration of the school district, and the Minnesota Department of Education (MDE). The child has a disability and participates in special education. This appears simple. However, because special education is set up and governed by detailed legislation and regulations, special education programs involve numerous complexities and acronyms. Relator, Independent School District No. 12 (the district), appeals a decision issued by respondent MDE. The decision was in response to a complaint by the child's parents pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482 (2006). Relator asserts that, in ruling on the parents' complaint, MDE erred in concluding that (1) it (the school district) violated IDEA by failing to list in the child's individualized education program (IEP) supplementary aids and services needed by the child to participate in extracurricular and other nonacademic activities that the parents had selected for her; (2) the parents could utilize IDEA complaint procedures when the district failed to address those supplementary aids and services in the IEP; and (3) the district was responsible for providing supplementary aids or services for the child at a fifth-grade graduation party sponsored by a parent-teacher organization (PTO). We affirm in part and reverse in part.

## FACTS

In January 2008, the district conducted a required three-year reevaluation of the child. As a part of this reevaluation, the district discussed with the parents pro-

posed accommodations [1] for the student in her classes and otherwise. Necessary accommodations were to be incorporated in the child's new 2008–09 IEP. On February 7, in advance of a meeting of the IEP team, the parents proposed accommodations for their daughter's participation in extracurricular activities. The proposed accommodations included special supervision after the regular school day and allowing their daughter to miss some practices or games. At that time, the parents did not identify, and the proposed accommodations did not relate to, any particular extracurricular activity.

On February 29, 2008, an IEP meeting was held. There is a factual dispute over what happened at that meeting incident to the parents' requested accommodations for extracurricular activities. The district contends that the parents and the district agreed that, because the child had not signed up for any specific activities, no accommodations had to be included in the 2008–09 IEP. The district adds that it was agreed that, if the child decided to participate in a specific activity, she had a right to equal treatment under section 504 of the Rehabilitation Act of 1973,[2] that the parents could require that the district prepare a plan for equal treatment under section 504 (instead of in the IEP), and that the district would comply with its obligations under a section 504 plan. The parents assert, and MDE found, that at the February 29 IEP meeting and at a subsequent IEP meeting held in March, district staff insisted that extracurricular activities could be addressed only in a section 504 plan and refused to discuss accommodations related to these activities. No ac-

commodations for extracurricular activities were included in the proposed IEP for 2008–09.

After the March 2008 meeting, the parents objected in writing to the proposed IEP. They also requested more information about "extracurricular/non-academic accommodations"; that "supervision at clubs ... [be] written into [their daughter's] IEP"; and that the IEP include some consideration of "nonacademic (Band)" activities; and they stated their position that the IEP team was legally required to consider extracurricular activities. In April 2008, the parents and district staff met to discuss extracurricular activities. The parents explained that they wanted to explore having their daughter participate in after-school clubs and volleyball. The district admits that, at that April meeting, the parents and district staff discussed a "specific [extracurricular] activity occurring in the fall of 2008," and what accommodations would be necessary for the child to participate in that activity. However, the district claims that the meeting had nothing to do with the child's "IEP or general education regular school day services" but was merely held to "determine eligibility for [section] 504 accommodations."

In May 2008, the parents met with district staff to discuss possible accommodations consisting of supplementary aids and services that could be furnished by the district at a fifth-grade graduation party sponsored by the PTO. The district determined that, because the PTO was a separate organization from the district

---

1. The parties appear to use the terms "accommodations" and "supplementary aids and services" interchangeably. The latter is the term found in the pertinent IDEA statutes and regulations. *See, e.g.,* 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

2. Section 504 "prohibits discrimination against the disabled by recipients of federal funding." *Barnes v. Gorman,* 536 U.S. 181, 185, 122 S.Ct. 2097, 2100, 153 L.Ed.2d 230 (2002). Section 504 is codified at 29 U.S.C. § 794 (2006).

and because the event was held offsite and outside the school day and was not district-funded, the district was not responsible for and would not provide supplementary aids or services for the child's attendance at the event.

The parents filed a complaint with MDE, the agency responsible for overseeing compliance with the IDEA in Minnesota. On July 15, 2008, MDE issued its decision, determining, as relevant to this appeal, that (a) the district violated IDEA regulations by failing to document in the IEP the accommodations necessary for the child to participate in extracurricular or other nonacademic activities, including the graduation party; and (b) the district failed to provide prior written notice concerning its refusal regarding accommodations. MDE ordered the district to implement the following corrective action: (1) convene the child's IEP team "to discuss supplementary aids and services the [s]tudent may need in the extracurricular and other nonacademic activities [her parents] have selected for her"; (2) document these accommodations in a revised IEP; and (3) develop a district-wide policy and inform staff and parents that the IEP team is required by law to document accommodations to enable children to participate in extracurricular and other nonacademic activities. This certiorari appeal followed.

## ISSUES

I. Did MDE err by requiring the district to include in the child's IEP accommodations necessary for the child to participate in selected extracurricular and nonacademic activities?

II. Did MDE err by concluding that the procedural requirements of IDEA were applicable to a complaint alleging the failure to include in an IEP accommodations for ex-

tracurricular and nonacademic activities required by IDEA?

III. Did MDE err by concluding that the PTO-sponsored graduation party was an activity subject to the accommodation requirements of IDEA?

## ANALYSIS

The Minnesota Constitution charges the legislature with the responsibility of establishing a uniform system of public schools. Minn. Const. art. XIII, § 1. Minnesota Statutes chapters 119A–127A address school finance, attendance, curriculum, school calendar, teachers, student conduct and rights, special education, and related subjects. Minnesota requires school districts to provide special education instruction and services for children with disabilities. Minn.Stat. § 125A.03(a) (2008). Generally, the state statutes governing special education refer to federal law. *Id.*; Minn.Stat. §§ 125.05(a), 125.08(a)(4) (2008). Because the parties do not assert any independent state-law basis for deciding the issues on appeal, we do not further consider Minnesota law.

IDEA ensures "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also Special Sch. Dist. No. 1 v. E.N.*, 620 N.W.2d 65, 68–69 (Minn.App.2000). The phrase "free appropriate public education" is often referred to by the acronym FAPE and expresses a fundamental principle of special-education law. IDEA defines FAPE to mean special education and related services that

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program [IEP] required under [20 U.S.C. § 1414(d).]

20 U.S.C. § 1401(9).

MDE is the state agency in Minnesota responsible for overseeing local school district compliance with IDEA. 20 U.S.C. § 1412(a)(11); Minn.Stat. § 120A.02(b) (2008). As part of its duties, MDE investigates complaints that a local school district is not providing required services to children with disabilities. 34 C.F.R. §§ 300.151–.153 (2008). If MDE finds that a local school district violated special education requirements, it must order the district to remedy the denial of those services, including "corrective action appropriate to address the needs of the child." 34 C.F.R. § 300.151(b)(1).

■■■ We observe a narrow scope of review in considering an appeal from an agency decision.

When reviewing agency decisions we adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001) (quotation omitted).[3] The decision of MDE in this area of IDEA oversight will not be reversed by this court unless it (1) reflects an error of law; (2) is arbitrary and capricious; or (3) is unsupported by the evidence. *Indep. Sch. Dist. No. 281 v. Minn. Dep't of Educ.*, 743 N.W.2d 315, 321 (Minn.App.2008).[4]

---

**3.** MDE argues that we owe a high degree of deference to the legal interpretations of the relevant federal regulations presented in the complaint decision. While we afford high deference to official agency action and interpretation of its regulations in certain circumstances, *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater (Annandale)*, 731 N.W.2d 502, 516 (Minn.2007), we are not persuaded that this MDE complaint decision is owed that degree of deference. The record indicates that the complaint was investigated by MDE's Division of Compliance and Assistance and that the decision was rendered by this division. This appeal is from that decision. Because it is unclear whether the complaint decision is a deliberate policy decision of MDE, as an agency, on the legal issue or is akin to the position of a hearing officer and because there is no showing that this interpretation of IDEA statutes and regulations is a technical or scientific matter different from questions generally considered by courts, we do not defer to the complaint decision on this interpretation of statutes and regulations. *Cf.*

*Annandale*, 731 N.W.2d at 516 (reviewing action by Minnesota Pollution Control Agency on complex technical-scientific matters).

**4.** IDEA is Spending Clause legislation. U.S. Const. art. I, § 8, cl. 1; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295, 126 S.Ct. 2455, 2458, 165 L.Ed.2d 526 (2006). The substantive requirements contained in IDEA come in the form of conditions placed on a state's receipt of federal funds. 20 U.S.C. § 1412(a). This informs our inquiry because, as Spending Clause legislation, IDEA should be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Murphy*, 548 U.S. at 296, 126 S.Ct. at 2459. In other words, the legislation should be viewed as a contract, and no obligations should be deemed to be imposed unless there is clear notice of the obligations. *Id.* We are aware that, when the language of a regulation is unclear or susceptible to different interpretations, we are to

■ We review the sufficiency of evidence supporting an agency's decision by applying the substantial-evidence test. *Hurrle v. County of Sherburne ex rel. Bd. of Comm'rs*, 594 N.W.2d 246, 249 (Minn. App.1999). Substantial evidence is "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; and (5) evidence considered in its entirety." *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 563 (Minn.App.2001), *review denied* (Minn. Nov. 13, 2001). We give considerable judicial deference to administrative fact-finding, *id.*, and apply an abuse-of-discretion standard of review. *Carter v. Olmsted County Hous. & Redevelopment Auth.*, 574 N.W.2d 725, 730 (Minn.App.1998).

## I.

The first and primary issue is whether MDE erred in interpreting IDEA and its implementing regulations to require school districts to include in IEPs the supplementary aids and services (accommodations) needed for a child to participate in extracurricular and nonacademic activities identified for that child by her parents.

### A. Application of IDEA to Extracurricular and Nonacademic Activities

■ An IEP is a plan that "sets out the child's educational performance, establishes annual and short term objectives for improvement in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Moubry v. Indep.*

*Sch. Dist. 696*, 9 F.Supp.2d 1086, 1091 n. 4 (D.Minn.1998). Federal law defines an IEP, what must be contained in an IEP, and who is required to write and authorized to amend the IEP. 20 U.S.C. § 1414(d). A fundamental aspect of IDEA is that a child's IEP is developed by a team that consists of, at minimum, the child's parents, a regular education teacher, a special education teacher, and a qualified representative of the school district. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321 (2008). When constructing an IEP, the IEP team must meet to consider (1) the strengths of the child; (2) the concerns of the parents for enhancing the education of the child; (3) the results of the child's formal evaluation; and (4) the child's academic, developmental, and functional needs. 20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324(a) (2008). Although parents are recognized as an integral part of the IEP team that formulates the IEP, section 1414(d) does not provide that parental concerns take precedence over the collaborative, reasoned decision-making of the team.

MDE points to specific language in IDEA providing that an IEP must contain

(IV) a statement of the special education and related services and supplementary aids and services ... to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—

. . . .

(bb) to be involved in and make progress in the general education cur-

consider whether, based on several factors, to afford a level of deference to an agency's interpretation of the regulation. *Annandale*, 731 N.W.2d at 516. Nonetheless, we are reluctant to interpret federal law to impose additional obligations on the state, where the

purported requirement is not clearly and unambiguously stated in the applicable federal legislation and MDE has not pointed to any previous adoption of this position in Minnesota that would give clear notice to those affected.

riculum ... and to participate in extracurricular and other nonacademic activities[.]

20 U.S.C. § 1414(d)(1)(A)(i)(IV). MDE argues that an IEP team must consider the aids and services necessary to support a child's participation in extracurricular and nonacademic activities, regardless of their nexus to educational needs.

MDE also points to U.S. Department of Education (DOE) regulations and accompanying commentary regarding extracurricular and nonacademic activities and the IEP. See 34 C.F.R. § 300.320(a)(4)(ii) (2008) (requiring statement in IEP of aids and services that will be provided to enable a student "to participate in extracurricular and other nonacademic activities"). In promulgating revised IDEA regulations in 2006, the DOE stated:

> States must ensure that public agencies take steps to provide nonacademic and extracurricular services and activities, including providing supplementary aids and services determined appropriate and necessary by the child's IEP Team to afford children with disabilities an equal opportunity for participation in those services and activities.

Supplementary Aids and Services, 71 Fed. Reg. 46578 (Aug. 14, 2006). In 2006, DOE regulations were revised to expand the statutory definition of "supplementary aids and services" as follows:

> Supplementary aids and services means aids, services, and other supports that are provided in regular education classes, other education-related settings, *and in extracurricular and nonacademic settings,* to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§ 300.114 through 300.116.

34 C.F.R. § 300.42 (2008) (emphasis added to indicate new language); cf. 34 C.F.R. § 300.28 (2006) (modified and renumbered in 2006). The new language in the regulations differs from the statutory language. See 20 U.S.C. § 1401(33) (defining "supplementary aids and services" as "aids, services, and other supports that are provided in regular education classes *or other education-related settings*" (emphasis added)). However, the regulation maintains as a point of reference the requirement that these accommodations are "to enable children ... to be *educated.*" 34 C.F.R. § 300.42 (emphasis added).

The district asserts that our determination of the appropriate contents of a child's IEP is limited by the concept of FAPE. The district argues that FAPE does not encompass extracurricular and nonacademic activities unless they are deemed necessary to advance a child's general education. Although this position appears logical, the analysis is awkward because the definition of FAPE expressly incorporates the contents of an IEP. 20 U.S.C. § 1401(9)(D). For this reason, the definitions of and interrelationship between FAPE and IEP have a circular quality.

■■■ Based on the language of the statute and regulations, we conclude that MDE was correct in determining that a child's IEP team has an obligation to *consider,* based on the student's overall situation and parental requests, whether the child's IEP should include a specific extracurricular activity and, if so included, identify the supplementary aids and services necessary for that child's participation in the activity. However, as concluded below, the IEP need only include such activities as are required for the education of the child. We reject the district's present assertion [5] that the IEP team has no duty

---

5. MDE points out that the district's legal posi- tions have changed as this controversy has

to consider the parents' request for accommodations for such activities, and we agree with MDE that it has the authority to order the district to convene an IEP team to consider the request and to make determinations in accordance with this opinion. Also, as further addressed below, we reject the relator's claim that, as a school district, it may require that the parents' challenge to the delivery of aids and services be addressed exclusively through a section 504 plan pursuant to 29 U.S.C. § 794(a).

*B. Identifying Activities—Generally*

■ While it is clear that an IEP must list supplementary aids and services (accommodations) that "will be provided" in support of extracurricular and nonacademic activities, it is less apparent what specific activities must be included in the IEP. MDE takes the position that parental selection of an extracurricular activity, without consideration of the activity's relationship to the child's educational needs, requires that the child's IEP include the activity and list accommodations for that child to participate in the activity.

■ The DOE regulations require that children with disabilities be provided with an equal opportunity to participate in extracurricular and nonacademic activities. 34 C.F.R. § 300.107(a) (2008). The regulations explain that the duty to provide an equal opportunity means that "each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent *appropriate to the needs of that child.*" 34 C.F.R. § 300.117 (2008) (emphasis added). Implicit in this language is the IEP team's discretion to determine whether participation in an activity is appropriate. We conclude that, under the statutory scheme,

this discretion necessarily rests with the IEP team. It is not a parental prerogative to require accommodations for every activity that the parent may identify.

MDE stated at oral argument that the federal statute and/or regulations had been modified in 2002 or 2004 to effectively embrace a requirement that the IEP include parent-selected activities. However, none of the changes to the statute in that time frame addressed this question. *See* Individuals with Disabilities Education Improvement Act of 2004, Pub.L. No. 108–446, 118 Stat. 2647 (codified as amended in scattered sections of 20 U.S.C.); George Miller, Comm. on Educ. and Labor, U.S. House of Representatives, *Key Changes in the Individuals with Disabilities Education Act (IDEA)* (2007), *available at* http://edlabor.house.gov/publications/IDEA 2004keychanges.pdf.

■ The regulations were modified in 2006 in order to implement the 2004 Congressional changes to IDEA. 71 Fed.Reg. 46540–46845 (Aug. 14, 2006). Although 34 C.F.R. § 300.42 was modified in 2006 to expressly mention extracurricular activities, as previously noted, it also retains the word "educated" as a touchstone of its requirements. This confirms that, for those activities to be addressed in an IEP, there must be some connection to an educational objective. While commentary from the DOE in the Federal Register could be read as requiring accommodations for extracurricular activities regardless of any nexus to education, at no point do the comments expressly state that position. *See* 71 Fed.Reg. at 46541, 46583, 46589, 46670.

We also note that other modifications to the regulations do not contain any language that would extend IDEA to such activities regardless of educational nexus.

proceeded.

*Compare* 34 C.F.R. § 300.107(a) (2008), *with* 34 C.F.R. § 300.306(a) (2008), *and* 34 C.F.R. § 300.117 (2008), *with* 34 C.F.R. § 300.553 (2002). The change is to explicitly state the obligation of the school to provide "supplementary aids and services" (accommodations) in the extracurricular area. There is no language that this includes any obligation to do so regardless of educational nexus. Given the pervasive popularity of extracurricular activities in our schools, the change claimed by MDE would be significant. If indeed such a change was intended, clear, explicit language to that effect, plus commentary, guidelines, and even bulletins or instruction might be expected, but MDE has not referenced any.

Our analysis is informed by the prominence of the word "education" in the law and regulations. IDEA and its implementing regulations are honeycombed with the word "education." This starts with the title of the act itself and extends into the language of virtually every section of the regulations. There are some statements, such as the language in 20 U.S.C. § 1414(d)(*l*)(A)(IV)(bb) and 34 C.F.R. § 300.320(a)(4)(ii), which require accommodations for extracurricular activities without any reference to education, but then there are cross-references that limit the scope of the mandate to what is in section 614 of IDEA. *See* 34 CFR § 300.320(d)(*l*) (2008). This section of the original act, codified as 20 U.S.C. § 1414, is replete with references to education. Also of interest is the virtual lack of any reference in reported litigation, DOE directive, DOE circular, or even state regulation that would extend IDEA to require accommodations for extracurricular activities that have no nexus to a child's educational objectives.

▆▆▆▆ Based on the foregoing analysis, we conclude that MDE erred in its interpretation of IDEA when it directed the district to provide accommodations for any extracurricular activity selected by a child's parent without regard to the nexus between the activity and educational needs and objectives. It is the IEP team's responsibility to determine whether a requested activity is appropriate for the child based on her strengths, the concerns for enhancing her *education*, the results of her evaluation, and her academic, developmental, and functional needs. *See* 20 U.S.C. § 1414(d)(3)(A) *and* 34 C.F.R. § 300.324(a). As previously stated, if the IEP team, in its discretion, determines that participation in a particular activity is appropriate for the education of that child, it must identify and list in the child's IEP the accommodations that will be provided in relation to that extracurricular activity.

## C. Identifying Activities—For This Child

Finally, we consider the district's assertion that MDE erred in determining that the parents had timely and reasonably identified activities in which the child wished to participate. The district asserts that it cannot be required to anticipate the accommodations necessary for a student to participate in any or all of the more than 100 extracurricular and nonacademic activities offered to students, particularly when the student has not identified any activities in which he or she will participate.

Contrary to the district's representation on appeal, the record supports the MDE finding that in the spring of 2008 the child's parents identified specific activities in which they wished the child to participate that fall. While the parents discussed general involvement in "clubs" and after-school activities, they listed volleyball and band as activities in which the child apparently had shown interest. The district also concedes that, at a meeting with the

parents in April 2008, the parents and district staff discussed a specific after-school activity occurring in the fall of 2008, and, following the meeting, district staff, in drafting a section 504 plan for the student, noted accommodations relevant to that activity. In April, the student had not registered for any specific extracurricular activity for the fall or made any oral or written commitment to a fall activity. The record does not indicate that the parents requested a burdensome consideration of an unreasonable range of activities. Furthermore, the record does not indicate sign-up for fall activities was available in April, and the district does not explain why an explicit commitment or enrollment is necessary or legally required for an IEP team to discuss the child's potential participation in the activity.

 Based on this record, we conclude there is substantial evidence supporting the MDE determination that the parents had adequately identified activities for the IEP team to consider. Although MDE did not err in ordering the district to reconvene the child's IEP team to discuss selected extracurricular and nonacademic activities, we have already stated that we conclude that MDE erred in ordering the district to include in the child's IEP accommodations that would be provided in connection with the parent-selected activities. That directive deprived the IEP team of the discretion to determine whether those activities are appropriate to the child's educational needs and objectives.

## II.

The second issue is whether MDE erred by determining that the parents of a child receiving special-education services could utilize IDEA procedural remedies if the IEP team refuses to consider and the district does not address accommodations for the child's participation in extracurricular and other nonacademic activities in the child's IEP.

IDEA provides:

Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

20 U.S.C. § 1415(a). The procedures include the right of the parent to make a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such a child." 20 U.S.C. § 1415(b)(6)(A); *see also* 34 C.F.R. § 300.507 (2008); Minn.Stat. § 125A.091 (2008) (requiring due-process procedures in similar circumstances). The definition of FAPE provided in section 1404 includes educational services and related services (accommodations) that "are provided in conformity with the [child's IEP]." 20 U.S.C. § 1404(9)(D). This is repeated in the federal regulations. 34 C.F.R. § 300.17 (2008).

 The district asserts that this case does not involve the denial of FAPE and, therefore, IDEA procedural safeguards do not apply. As previously discussed, the statutory language in IDEA incorporates into the definition of FAPE the contents of a child's IEP. Accordingly, when a parent alleges that an IEP fails to include required information, that allegation is necessarily a challenge to the provision of FAPE.

The district asserts that MDE's determination that IDEA's complaint-handling procedures are applicable improperly

preempted the process for enforcing compliance with section 504 actions. *See* 29 U.S.C. § 794. Section 504 provides certain rights to qualified persons and an enforcement process. Neither statute preempts the other. The district asserts that MDE further erred by assuming oversight of the district's compliance with section 504, with regard to which MDE has no enforcement authority.

■ We do not read MDE's order to address compliance with section 504, but rather to recognize that compliance with section 504 does not serve as a substitute for, or preempt compliance with, the IDEA. *See, e.g., Muller v. Comm. on Special Educ.,* 145 F.3d 95, 105 n. 9 (2d Cir. 1998) (explaining that proposed plan under section 504 of the Rehabilitation Act is not an adequate substitute when an IEP is required: "Although the provision of an IEP under the IDEA will sometimes satisfy a district's § 504 obligations, the converse is not generally true." (citation omitted)). As already discussed, to the extent the parents believed that the district violated IDEA, they could file a complaint and seek relief pursuant to that process. If the IEP team properly determines that IDEA does not require the requested accommodation, the parent may pursue relief under section 504. Therefore, we conclude MDE did not improperly preempt section 504.

## III.

■ The last issue is whether MDE erred when it ruled that the district was responsible for providing accommodations for the child at the PTO graduation party. As we discussed above, if an IEP team determines that a particular extracurricular activity is appropriate to a child's educational needs, the IEP team must provide

a statement of accommodations related to that activity in the child's IEP. The issue here is whether the graduation event is an extracurricular or nonacademic activity within the meaning of the IDEA and implementing regulations.

Nonacademic and extracurricular activities include "recreational activities" and "special interest groups or clubs sponsored by the public agency." 34 C.F.R. § 300.107(b) (2008). MDE determined that the PTO was a "special interest group or club sponsored by [the district]," that the class-wide graduation party was a "recreational activity," and that, as such, the IEP team was required to identify accommodations necessary for the student to have an equal opportunity to participate in that event. The record includes literature prepared by the district and the PTO that indicates some cooperation between the PTO and the student's school on programs and initiatives to benefit students.

■ In an era of tight school budgets and widespread parental and community interest in the development of young people, activities conducted apart from the schools are not rare and should not be discouraged. Although such programs should not become a ploy to subvert IDEA, IDEA does not purport to reach into the conduct of bona fide, independent programs. Here, there is no factual dispute. This graduation party was an activity held away from school premises, was outside the school day, was not district-funded, and was not supervised by district staff. There is no evidence that the event was school initiated or that the PTO is a district-sponsored organization. IDEA does not require that schools provide special-education services at community events that involve children, even if they celebrate a school-related milestone.[6]

6. Our decision does not preclude a school district from furnishing accommodations.

Such a result would unreasonably expand the meaning of being "sponsored by" a district.

We conclude that the PTO graduation party is not within IDEA's definition of "nonacademic and extracurricular activities."

## DECISION

We affirm MDE's determination that the parents identified an extracurricular activity sufficiently to require the child's IEP team to consider whether the activity should be in the child's IEP and, if so, what accommodations are appropriate. We reverse MDE's determination that the parents' request for accommodations for an extracurricular activity alone necessitates inclusion of accommodations for the activity in the child's IEP and its determination that such accommodations are required regardless of a nexus between the activity and an appropriate education for the child. We affirm MDE's determination that IDEA procedures apply to a complaint alleging a failure to include required accommodations in an IEP and conclude that such process is not precluded by section 504 of the Rehabilitation Act of 1973. We reverse MDE's determination that the district must provide special-education support for a PTO-sponsored event held off school grounds, outside the school day, not financed by the school district, and not supervised by school staff.

**Affirmed in part and reversed in part.**