**INDEPENDENT SCHOOL DISTRICT NO. 12, Centennial, Respondent,**

v.

**MINNESOTA DEPARTMENT OF EDUCATION, Appellant.**

No. A08–1600.

Supreme Court of Minnesota.

Oct. 7, 2010.

Paul C. Ratwik, Erin E. Ische, Christian R. Shafer, Ratwik, Roszak & Maloney, P.A., Minneapolis, Minnesota, for respondent.

Lori Swanson, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, MN, for appellant.

Joseph E. Flynn, Peter A. Martin, Knutson, Flynn & Deans, P.A., Mendota Heights, MN, for amicus curiae Minnesota School Boards Association.

Daniel J. Stewart, Minneapolis, MN, for amicus curiae Minnesota Disability Law Center.

## OPINION

MEYER, Justice.

This case addresses the scope and operation of a school district's obligation under the federal Individuals with Disabilities Education Act (IDEA) to provide disabled students an equal opportunity to participate in extracurricular and nonacademic activities. Here, the parents of a disabled student in Independent School District No.12, Centennial (the School District), respondent, requested that the student's Individual Education Program (IEP) team consider supplementary aids and services to enable the student to participate in extracurricular and nonacademic activities. The School District refused to consider the requested supplementary aids and services at the student's IEP team meetings. The parents filed a complaint with the Minnesota Department of Education (the Department), appellant. In its complaint decision, the Department concluded that the School District violated IDEA by refusing to consider the requested supplementary aids and services for inclusion in the student's IEP. The School District appealed.

The court of appeals held that IDEA requires that an IEP team consider whether an extracurricular and nonacademic activity is appropriate for a disabled student and, if so, provide supplementary aids and services necessary for participation. *Indep. Sch. Dist. No. 12, Centennial v. Minn. Dep't of Educ.*, 767 N.W.2d 478, 486 (Minn.App.2009). But the court further held that an IEP need only consider extracurricular and nonacademic activities "required for the education of the [disabled

student]." *Id.* The Department petitioned our court for review. We granted review to determine whether the IDEA regulations limit the extracurricular and nonacademic activities included in an IEP to only those "required for the education" of disabled students. We hold that the IDEA regulations contain no such limit.

This case involves a fifth-grade student diagnosed with autism spectrum disorder. As part of her condition, the student experiences tics when feeling anxiety that prevents the student from working. The condition also creates "strong sensory needs" in the student, who must occasionally have "motor breaks" to "move about in the classroom." The student has also been recently diagnosed with Tourette Syndrome and frequently struggles with motor, vocal, and facial tics, especially when anxious.

Because the student met the state eligibility criteria, the student was determined eligible for, and in need of, special education and related services. Like all public school children who receive special education and related services, the student's educational needs are met through development of an IEP. An IEP is a personalized plan detailing a disabled student's unique educational needs and identifying necessary accommodations. *See generally* 20 U.S.C. § 1414(d) (2006). A team consisting of the student's teachers, parents, school administrators, related service personnel, and, when appropriate, the student creates the IEP. 20 U.S.C. § 1414(d)(1)(B). The IEP must be reviewed at least annually but can be reviewed more frequently if the student's parents or school asks for a review. 20 U.S.C. § 1414(d)(4).

■ In February 2008, the student's parents e-mailed a list to the school psychologist of supplementary aids and services they believed were necessary for the student to participate in extracurricular and nonacademic activities, to be discussed at the student's upcoming IEP team meeting. The list included that the student be allowed to miss some practices and games to manage health concerns and stress, be provided adult supervision after the activity until an adult or the activity bus picked her up, and have access to her cell phone during the activity. The student's IEP team convened twice during February and March 2008. The parents allege that the School District refused to discuss the proposed supplementary aids and services at either meeting. The parents further allege that the School District told the parents that Section 504 plans, not IEPs, address participation in extracurricular and nonacademic activities.[1] The School District alleges that the parents asked the School District to hold a Section 504 meeting to discuss supplementary aids and services for extracurricular activities, which the parents dispute.[2]

---

1. Section 504, a civil rights statute, refers to the Rehabilitation Act of 1973, which prohibits programs receiving federal financial assistance from excluding, denying benefits to, or discriminating against otherwise qualified individuals with disabilities. Rehabilitation Act of 1973, Pub.L. No. 93–112, 87 Stat. 355; 29 U.S.C. § 794 (2006). The procedural safeguards available to protect against a Section 504 violation are different than those available to protect against an IDEA violation. *Compare* 29 U.S.C. § 794(d) (citing 42 U.S.C. §§ 12111–117, 12201–204, 12210 (2006)) (Section 504) *with* 20 U.S.C. § 1415 (2006) (IDEA).

A Section 504 meeting is attended by "a group of persons, including persons knowledgeable about the child, [the child's evaluative data], and the placement options." 34 C.F.R. § 104.35(c)(3) (2010). Individual school districts determine which parties must be included in their policy for implementing Section 504.

2. The Department's complaint decision resolves this factual dispute in favor of the par-

Two Section 504 meetings occurred in April and May of 2008. In April, the parents met with the middle school activities director and special education coordinator to discuss the student's participation in volleyball and after-school clubs. The Section 504 draft plan that resulted did not include the parents' suggested supplementary aids and services. In May, the parents met with the special education coordinator and Section 504 coordinator to determine what supplementary aids and services were required for the student to attend a class graduation party. The School District asserted it was not responsible for accommodating the student's attendance at the party because the party took place off-site, outside the normal school day, and was hosted by the parent-teacher organization, a private group.[3]

The parents filed an IDEA complaint with the Department. On July 15, 2008, the Department issued a complaint decision concluding that the School District violated the IDEA regulations when it failed to convene an IEP team to consider the student's participation in volleyball, after-school clubs, and the graduation party.[4]

The Department ordered the School District to convene the IEP team to discuss and document the IEP supplementary aids and services that the team determined appropriate and necessary for the student to participate in the extracurricular and nonacademic activities requested by the parents.

The School District appealed the Department's order. The court of appeals upheld the Department's decision in part. *ISD No. 12*, 767 N.W.2d at 491. The court affirmed the Department's determination that the IEP team must consider whether an extracurricular and nonacademic activity should be included in the IEP and, if so, what supplementary aids and services are necessary to enable the student's participation. *Id.* But the court reversed the Department's determination that supplementary aids and services for an extracurricular or nonacademic activity may be included in an IEP "regardless of a nexus between the activity and an appropriate education for the child." *Id.* Rather, the court held that an IEP need include supplementary aids and services necessary for

ents based on e-mail exchanges between the parents and the School District and based on the School District's repeated statements that an IEP does not address supplementary aids and services for participation in extracurricular and nonacademic activities not related to receiving a free appropriate public education. We review an agency's factual determinations for whether the determination is supported by substantial evidence. *St. Paul Area Chamber of Commerce v. Minn. Pub. Serv. Comm'n*, 312 Minn. 250, 258–59, 251 N.W.2d 350, 356 (1977). Here, the record provides substantial evidence to support the Department's determination.

3. The Department did not seek review of the court of appeals' conclusions with respect to the graduation party. The Department's petition for review addresses only the student's participation in volleyball and after-school clubs.

4. The complaint decision also concluded that (1) the School District violated 34 C.F.R. § 300.321 (2010), by permitting a general education teacher to leave an IEP team meeting early, without the written agreement of the parents, and failing to include required team members at subsequent team meetings to discuss the provision of supplementary aids and services that should have been considered for inclusion in the IEP; (2) the School District violated 34 C.F.R. § 300.503 (2010) and Minn. R. 3525.3600 (2009), by failing to provide prior written notice concerning its consideration and refusal of the parents' request to include supplementary aids and services in the IEP; and (3) the School District did not violate confidentiality requirements under 34 C.F.R. §§ 300.622 or 300.623 (2010). Issues regarding meeting attendance, written notice, and confidentiality were not appealed to this court.

the student's participation only in "such activities as are required for the education of the child." *Id.* at 486. The Department petitioned for review, arguing that the IDEA regulations require an IEP team to consider supplementary aids and services for participation in extracurricular and nonacademic activities regardless of an activity's relationship to an educational objective.

## I.

Originally enacted in 1975 as the Education for All Handicapped Children Act, the Individuals with Disabilities Education Act (IDEA) governs how states and agencies that receive special education funding from the federal government provide education to disabled students. *See generally* Pub.L. No. 94–142, 89 Stat. 773 (1975) (codified as amended at 20 U.S.C. §§ 1400–1482 (2006)). The purposes of IDEA are to provide a free appropriate public education, ensure and protect the rights of disabled students, assist states and localities to provide special education, ensure that educators and parents have the tools needed to improve results in special education, and assess and ensure effectiveness of special education. 20 U.S.C. § 1400(d) (2006). To be eligible to receive IDEA funds, states must establish policies to ensure that the state provides a free appropriate public education, establishes a "[f]ull educational opportunity goal," executes IEPs according to statutory requirements, and educates the disabled student to the maximum extent appropriate with other children. 20 U.S.C. § 1412(a)(1)-(2), (4)-(5) (2006).

A free appropriate public education is defined as special education and related services that are provided without charge at public expense and under public supervision, meet state educational standards, include appropriate education at all levels in the state, and are provided in conformity with an IEP. 20 U.S.C. § 1401(9) (2006). An IEP is a written statement provided for each special education student. 20 U.S.C. § 1401(14) (2006). Each IEP must be developed, reviewed, and revised in accordance with IDEA requirements. *Id.* Under IDEA, an IEP includes the following: (1) a statement of the child's present academic achievement and functional performance; (2) a statement of measurable academic and functional goals; (3) a description of how a child's progress towards meeting goals will be measured; (4) a statement of the special education and related services, and supplementary aids and services that will be provided for the child; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in regular classes and activities; and (6) a statement of individual, appropriate accommodations necessary to measure academic achievement and functional performance on state and district-wide assessments. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VI).

This case focuses on the fourth item mentioned above: a statement of the special education, related services, and supplementary aids and services to be provided to or on behalf of the child. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). This part of an IEP must also include a statement of program modifications or supports to be provided for the child to advance the student toward attaining annual goals, be involved in and make progress in the general curriculum, participate in extracurricular and other nonacademic activities, and be educated and participate with other children in activities. *Id.* Although under IDEA a student's IEP must include a statement of program modifications to be provided for the student to participate in extracurricular and other nonacademic activities, IDEA does not define extracurricular and nonacademic activities. *See* 20 U.S.C.

§ 1401. Therefore, we turn to the federal regulations promulgated pursuant to IDEA.

## II.

Federal regulations promulgated pursuant to IDEA reiterate and supplement statutory provisions. *See generally* 34 C.F.R. Part 300 (2010). IDEA provides that the Secretary of Education shall issue regulations to ensure compliance with IDEA requirements. 20 U.S.C. § 1406(a) (2006). The Secretary may not implement or publish a regulation or issue a policy letter or other statement that violates or contradicts IDEA. 20 U.S.C. §§ 1406(b)(1), 1406(d) (2006). The Secretary may also not implement or publish a regulation that "lessens the protections provided to children with disabilities under [IDEA]," except to the extent the regulation reflects the "clear and unequivocal intent of Congress in legislation." 20 U.S.C. § 1406(b)(2) (2006).

[2–4] We review the regulations to find a definition of "extracurricular and nonacademic activities." More specifically, we review the regulations to determine whether the definition of "extracurricular and nonacademic activities" for which supplementary aids and services must be provided is limited to only those activities required for the education of the child. Interpreting a regulation is a question of law reviewed de novo. *See In re Rate Appeal of Benedictine Health Ctr.*, 728 N.W.2d 497, 503 (Minn.2007). As with statutes, when interpreting a regulation, the court first determines whether the regulation is "clear or ambiguous on its face." *Risdall .v. Brown–Wilbert, Inc.*, 753 N.W.2d 723, 732 (Minn.2008). If the regulation is unambiguous, the court construes the regulation according to the common and approved usage of its words and phrases and does not disregard the regulation's plain meaning to pursue its spirit. *See* Minn.Stat. §§ 645.08, 645.16 (2008); *Risdall,* 753 N.W.2d at 732.

■ The parties here focus on three IDEA regulations: 34 C.F.R. §§ 300.320, 300.107, and 300.117 (2010). The first regulation, section 300.320, was promulgated pursuant to 20 U.S.C. § 1414(d)(1)(A), and defines the required contents of an IEP. Nearly verbatim to its statutory counterpart, section 300.320 states that an IEP must include:

(4) [a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child ...

(ii) [t]o be involved in and make progress in the general education curriculum ... and to participate in extracurricular and other nonacademic activities....

34 C.F.R. § 300.320(a)(4).

The second regulation, section 300.107, defines free appropriate public education as it relates to state eligibility for federal funding. Section 300.107 states:

The State must ensure the following:

(a) Each public agency must take steps, including the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team, to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities.

(b) Nonacademic and extracurricular services and activities may include counseling services, athletics, transpor-

tation, health services, recreational activities, special interest groups or clubs sponsored by the public agency, referrals to agencies that provide assistance to individuals with disabilities, and employment of students, including both employment by the public agency and assistance in making outside employment available.

The third regulation, section 300.117, requires that disabled students be educated to the maximum extent appropriate, with nondisabled students, including participating in extracurricular and nonacademic activities and receiving necessary supplementary aids and services for such participation. Section 300.117 states:

In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in § 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings.

We consider whether the plain language of the above IDEA regulations limits extracurricular and nonacademic activities reflected in an IEP to those required to educate the disabled student. Section 300.320(a)(4) requires that supplementary aids and services to the maximum extent appropriate to the needs of the student necessary to enable the disabled student to participate in extracurricular and nonacademic activities be included in the student's IEP. The section does not modify or restrict the meaning of "extracurricular and nonacademic activities" for which supplementary aids and services must be provided.

Furthermore, section 300.107 requires a school district to take steps to provide those supplementary aids and services that have been determined appropriate and necessary by the IEP team to afford the disabled student an equal opportunity to participate in extracurricular and nonacademic activities. Section 300.107(b) provides a nonexhaustive list of examples of extracurricular and nonacademic activities.[5] Section 300.107(b) expressly includes athletics, clubs, and activities offered by groups sponsored by the school district.[6] But the section does not otherwise limit those extracurricular and nonacademic activities eligible for inclusion in the IEP.

Section 300.117 requires that a disabled student receive supplementary aids and services determined necessary and appropriate for participation in nonacademic settings and further requires that the disabled student participate in extracurricular and nonacademic activities to the maxi-

---

5. The extracurricular and nonacademic activities listed in section 300.107(b) are "counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the public agency, referrals to agencies that provide assistance to individuals with disabilities, and employment of students, including both employment by the public agency and assistance in making outside employment available." Section 300.117 also lists meals and recess as extracurricular and nonacademic activities for which supplementary aids and services must be provided.

6. The activities at issue in this case—volleyball, after-school clubs, and a graduation party held by a School District-sponsored group—fall within the scope of section 300.107(b).

mum extent appropriate with nondisabled students. Section 300.117 does not limit what qualifies as an extracurricular and nonacademic activity. Instead, the section further defines extracurricular and nonacademic activities to include meals and recess as well as the activities listed in section 300.107(b).

Overall, the plain language of sections 300.320(a)(4)(ii), 300.107, and 300.117 does not limit extracurricular and nonacademic activities for inclusion in an IEP to those required to educate the disabled student. To limit extracurricular and nonacademic activities to those required only to educate the disabled student would require adding or reading words into the above IDEA regulations. As with statutes, we will not read into a regulation provisions that the promulgating entity has omitted, either purposefully or inadvertently. *Cf. Reiter v. Kiffmeyer,* 721 N.W.2d 908, 911 (Minn. 2006). Because sections 300.320(a)(4)(ii), 300.107, and 300.117 do not limit extracurricular and nonacademic activities included in an IEP to those required to educate the disabled student, we decline to read such a limitation into the IDEA regulations.

Other IDEA regulations expressly limit their application to services necessary to provide a free appropriate education. For example, 34 C.F.R. § 300.105(b) (2010) states: "On a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or in other settings is required if the child's IEP Team determines that the child needs access to those devices in order to receive FAPE [free appropriate public education]." Similarly, 34 C.F.R. § 300.106 (2010) states that each school district "must ensure that extended school year services are available as necessary to provide FAPE [free appropriate public education]" and that "[e]xtended school year services must be provided only if a child's IEP Team determines ... that the services are necessary for the provision of FAPE [free appropriate public education] to the child." A free appropriate public education encompasses only services necessary to provide disabled students with educational and instructional benefits. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 203–04, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Given the free appropriate public education limitations on 34 C.F.R. §§ 300.105(b) and 300.106, it is clear that the Secretary of Education understood how to limit the application of an IDEA regulation to services that provide educational and instructional benefits. Thus, the federal government could have limited extracurricular and nonacademic activities included in sections 300.320(a)(4)(ii), 300.107, and 300.117 to those required for the education of the disabled student. Despite opportunity and ability, the Secretary articulated no such limitation here.[7]

---

7. The School District argues that to interpret "extracurricular and nonacademic activities" to include activities not required to educate disabled students renders the regulation ultra vires. A regulation is ultra vires if it exceeds the scope of power authorized by statute. *See Black's Law Dictionary* 1662 (9th ed.2009) (defining "ultra vires" as "[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law."). As noted, IDEA requires the Secretary of Education to implement and publish regulations necessary to ensure compliance with specific IDEA provisions so long as the regulations do not lessen protections afforded disabled children under the Act. 20 U.S.C. §§ 1406(a), 1406(b). IDEA requires that an IEP include a statement of supplementary aids and services to be provided to a disabled child to facilitate the child's participation in extracurricular and nonacademic activities. 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb). The statute does not limit the meaning of "extracurricular and nonacademic activities." *See* 20 U.S.C. § 1414 (2006). The corresponding regulation, section 300.107, also does not limit the scope of "extracurricular and nonacademic

Beyond not limiting what extracurricular and nonacademic activities may be included in an IEP, the plain language of the IDEA regulations establishes the manner in which school districts must provide access to extracurricular and nonacademic activities. Section 300.107(a) requires that school districts take steps to provide extracurricular and nonacademic activities in a manner necessary to afford the disabled student an *equal* opportunity to participate. On this point, the court of appeals' holding contravenes the plain language of section 300.107. The court held that an IEP need only include activities required for the education of a disabled student. *ISD No. 12*, 767 N.W.2d at 486. Such a holding effectively requires a disabled student to prove that he or she will receive an educational benefit from participating in an extracurricular and nonacademic activity in order to receive the supplementary aids and services necessary to participate. Nondisabled students are required to make no such showing. Requiring disabled students to prove an educational benefit, when nondisabled students need not, does not afford disabled students an equal opportunity to participate in extracurricular and nonacademic activities. Thus, the court of appeals' holding violates the "equal opportunity" for participation in extracurricular and nonacademic activities required by the plain language of section 300.107.

The court of appeals held that the IEP team should consider whether a disabled student's participation in an extracurricular and nonacademic activity is appropriate. *See ISD No. 12*, 767 N.W.2d at 487. The court further held that IDEA does not permit parents to dictate unilaterally the content of an IEP. *Id.* We agree. Section 300.117 states that a school district must ensure that a disabled student participates in extracurricular and nonacademic activities with nondisabled students to the maximum extent "appropriate to the needs of that [disabled student]." As the court of appeals noted, the phrase "appropriate to the needs" indicates that a disabled student may participate in extracurricular and nonacademic activities that are "appropriate." The plain language of the IDEA regulations indicates that the IEP team is designated to determine which activities are "appropriate." *ISD No. 12*, 767 N.W.2d at 487. For example, section 300.107(a) states that a school district must provide supplementary aids and services "determined appropriate and necessary by the [student]'s IEP Team" to participate in extracurricular and nonacademic activities. Similarly, section 300.117 requires that a school district ensure that a disabled student has the supplementary aids and services "determined by the [student]'s IEP Team to be appropriate and necessary for the [student] to participate in nonacademic settings." Accordingly, we affirm the court of appeals' holding that the IEP team must determine whether an extracurricular and nonacademic activity is appropriate for a disabled student and which supplementary aids and services are appropriate and necessary to participate in these activities.

In sum, the plain language of IDEA regulations 34 C.F.R. §§ 300.320(a)(4)(ii), 300.107, and 300.117 establishes that the extracurricular and nonacademic activities that may be included in an IEP are not limited to those activities required to educate the disabled child. The plain lan-

activities." Section 300.107 is necessary to ensure compliance with 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb), and it does not lessen protections afforded disabled children under IDEA. Thus, the Secretary possessed adequate power to implement the regulation. The implementation of section 300.107 is therefore not ultra vires, and we interpret it according to its plain language.

guage of the regulations further establishes that a disabled student's IEP team is the appropriate entity to determine what activities are appropriate for inclusion in the student's IEP.[8] Accordingly, we reverse the court of appeals in part, affirm in part, and reinstate the Department's order consistent with this opinion.

Affirmed in part and reversed in part.

PAGE, J., took no part in the consideration or decision of this case.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, G. Barry, Justice (concurring in part, dissenting in part).

I concur in the opinion of the court insofar as it holds that the responsibility of determining which activities are appropriate for a student rests with the IEP team, but I disagree that the statutes and regulations do not require some consideration of the connection of an extracurricular activity to the educational needs of a student.

The majority states that "the plain language of sections 300.320(a)(4)(ii), 300.107, 300.117 does not limit extracurricular and nonacademic activities for inclusion in an IEP to those required to educate the disabled student." *Supra* at 914. That is true; those words are not found there. The majority further states that "[r]equiring disabled students to prove an educational benefit, when nondisabled students need not, does not afford disabled students an equal opportunity to partici-

pate in extracurricular and nonacademic activities." *Supra* at 915.

After underscoring the requirement of equal opportunity to participate in extracurricular and nonacademic activities, however, the majority states that "[t]he plain language of the IDEA regulations indicates that the IEP team is designated to determine which activities are 'appropriate.' ... Accordingly, ... the IEP team must determine whether an extracurricular and nonacademic activity is appropriate for a disabled student." *Supra* at 915. Thus, equal opportunity to extracurricular activities is not equal opportunity to any and all activities, but only those activities that the IEP team deems appropriate. This begs the question of what is appropriate and how the IEP team is to go about making such a determination.

In assigning this gatekeeper duty to the IEP team, the majority relies in part on section 300.117, which refers to appropriateness "to the needs of that child." To me, it is necessary for the IEP team in making its assessment of appropriateness to look at the needs of the child. This, of course, requires asking what the needs of the child are and what sort of needs the IEP team is supposed to consider. Section 300.324 provides some guidance by stating that "[i]n developing each child's IEP, the IEP Team must consider ... [t]he academic, developmental, and functional needs of the child." I view these, generally speaking, as "educational" needs. Therefore, I would hold, like the majority, that parents of a disabled child cannot unilaterally dictate the content of an IEP,

8. Both the School District and the Minnesota School Boards Association, in an amicus curiae brief, argue that a broader interpretation of "extracurricular and nonacademic activities" will impose additional administrative and fiscal burdens on school districts. The Department does not agree. We are not unsympathetic to concerns of increased administrative and fiscal burdens on school dis-

tricts. But the court may only consider the effects of a particular regulatory interpretation if the regulation is ambiguous. *See* Minn.Stat. § 645.16. In this case, we hold that the regulation is unambiguous and interpret only its plain language. Thus, we may not consider the budgetary effects, if any, of any particular interpretation.

and that when an IEP team is determining which supplementary aids and services are appropriate and necessary for nonacademic and extracurricular services, the team must first consider whether the nonacademic and extracurricular services are appropriate. But I would further hold that the IEP team's determination of which nonacademic and extracurricular services are appropriate necessarily involves consideration of the child's educational needs. The use of the word "appropriate" indicates that not all nonacademic settings or extracurricular activities are suitable.

IDEA is an ambitious piece of legislation laudably aimed at securing and furthering the education of disabled children, and IDEA has far-reaching effects. In Minnesota alone, 14.7% of students are receiving special education services under an IEP. Given that high number, coupled with the fact that section 300.324(b)(i) requires periodic review of each child's IEP, it is easy to see that any interpretation of the regulations and statutes requires a delicate balance of furthering the education of disabled children with feasible requirements for school districts.