# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2091

_____

Renee Sneitzer

*Plaintiff - Appellant*

v.

Iowa Department of Education; Cedar Rapids Community School District; Grant Wood Area Education Agency

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: February 10, 2015
Filed: August 7, 2015

_____

Before BYE, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Renee Sneitzer's daughter (K.S.) was a student in the Cedar Rapids Community School District (the district). K.S. is diagnosed with a form of high functioning autism

known as Asperger Syndrome. Renee appeals the district court's[1] denial of her petition for review of an order issued by an administrative law judge[2] in an Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., (IDEA) case against the district. Because the district provided K.S. with a Free Appropriate Public Education (FAPE), we affirm.

## I.    BACKGROUND

K.S. was 16 at the time of the proceedings before the ALJ, and in addition to Asperger Syndrome, she has also been diagnosed with obsessive compulsive disorder, mood disorder, adjustment disorder, and Tourette's syndrome. These diagnoses significantly affect K.S.'s communication, socialization, and behavior. K.S. was a freshman and sophomore at Cedar Rapids Kennedy High School during the 2010-11 and 2011-12 school years, respectively, and resided with her step-father and Renee within the district. K.S. is considered "twice exceptional" meaning that she is both gifted academically, with a full scale IQ of 123, and on the autism spectrum. She excels in math and science; successfully took several advanced placement classes at Kennedy, and she was involved in extracurricular activities including show choir,[3] the school musical, and volleyball.

---

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

[2]Christie J. Scase, Administrative Law Judge, Iowa Department of Inspections and Appeals.

[3]Kennedy's high school show choir program is highly touted, nationally known, and award-winning. The varsity show choir is known as Happiness and the JV choir is known as Protégé. And, there is a third-tier choir below Protégé for underclassmen, which K.S. participated in as a freshman. Participation in each choir requires a try-out selection process.

Due to her diagnoses, K.S. was identified as an individual with a disability under the IDEA, and has received special education and related services under an individualized education program ("IEP"). Further, K.S. participated in the autism spectrum disorder (ASD) program beginning in sixth grade and throughout her remaining years in the district. Kathy Klein taught the ASD class and provided specifically-designed instruction for high functioning ASD students. As relevant to this appeal, K.S.'s IEP was reviewed and revised in January 2011, to cover the period from January 2011 to January 2012. The IEP contained three behavior goals for K.S.: (1) a goal to help her follow directions; (2) a goal to help her develop appropriate and respectful behavioral responses to peers and adults; and (3) a goal to enable her to better understand social rules and behavior expectations. The district also provided K.S. with one-on-one paraprofessional support throughout the entirety of the school day. K.S. could return to the ASD classroom any time during the school day, and also could use the ASD classroom to take tests in a quiet environment. Despite all of K.S.'s social difficulties, and in keeping with her gifted intellectual abilities, the record shows that K.S. remained in the general education setting for the majority of her day, maintained a GPA above 4.0 (because of advanced placement classes), and ranked near the top ten percent of her class while at Kennedy.

As the ALJ aptly noted, the beginning of the year 2012 was very traumatic for K.S. and her family. While her family vacationed over Christmas break on a Caribbean cruise, K.S. was raped by two young men on the cruise ship. Immediately after the rape, Renee consulted with K.S.'s medical team regarding how to assist K.S. in overcoming this trauma. K.S.'s pediatrician prescribed a course of medication for K.S., and K.S.'s mental health providers recommended getting her back into a routine as quickly as possible. They suggested asking K.S. what she wanted to do, and her first request was to get back into show choir. Thus, shortly after the semester resumed from winter break, K.S. returned to class and to participation in the school's Protégé show choir in January 2012. The annual review of K.S.'s IEP had been scheduled for January 2012. Due to the unusual circumstances, Renee agreed to postpone the annual

review in lieu of an interim IEP, which was dated January 11, 2012. The interim IEP maintained the same specially designed instruction and support services from the prior IEP. However, several additional accommodations were also implemented in January to ease K.S.'s transition back to school after the rape. For instance, one of the accommodations was that she was allowed to reduce or makeup her assignment load for certain classes, allowing her to work at her own pace. Klein testified that the understanding in January 2012 was that a full-scale review and revision would be performed on the IEP in September 2012 for the fall semester, after everyone had a better understanding of how K.S. had healed and hopefully recovered from the trauma.

Because state regulations mandate that an interim IEP not be in place for more than 30 school days, the IEP team met again on February 10, 2012. Renee still was occupied with criminal proceedings and other issues surrounding the rape, and agreed that the meeting could be held without her. She and K.S.'s father also waived any procedural objection to the IEP being reviewed without their participation. Due to the lack of parental participation and the understanding reached in January that it would be best for K.S. to hold off a comprehensive meaningful review until September 2012, the IEP team made the affirmative decision to retain the existing IEP until the fall of 2012.

K.S. experienced a number of unsettling social interactions with peers and other emotional disappointments in the Spring 2012 semester. After a show choir performance on January 7, 2012, K.S. reported to her mother that a male member of the show choir held a knife to her throat and said, "I'm going to cut you, bitch." Renee immediately confronted the student and one of the directors. The student indicated that he had found a pocket knife in one of the drama rooms, but denied approaching K.S. with the knife. The director admonished him for handling a knife, the incident was investigated by the principal, and no further action was taken against this student. Also during the spring of 2012, K.S. auditioned and was selected for a role in the high school musical, "Fame." On April 19, opening night of the musical, K.S. and another

student were involved in an altercation backstage wherein K.S. accused the student of "poking" her repeatedly. Other students who were backstage reported that the student had tapped K.S. on the shoulder asking her to move out of the way of performers leaving the stage following a scene, and K.S. responded by slapping the student and using foul language. The principal initially threatened to suspend K.S. for one night of the musical over the incident, but eventually determined that K.S. would not be suspended as long as a paraprofessional accompanied K.S. while she was backstage. Another IEP meeting occurred on May 2, called specifically by Klein and Renee to address, among other things, the incident backstage during the musical. Following this meeting, language was added to the IEP to add paraprofessional support for K.S.'s extracurricular activities.

The next major issue for K.S. during the spring of 2012 was the audition process for show choir for the upcoming school year. K.S. had participated in the lower-tier show choir as a freshman, and Protégé as a sophomore during the 2011-2012 school year. The audition is in two-parts–the first is a blind vocal audition (worth 60%) where singers are heard, but not seen, and scored by judges. The second part is a dancing component (worth 40%). More than 100 girls tried out for 52 total available positions in Happiness and Protégé. K.S.'s scores left her at 62nd, 10 places from making the Protégé choir and 35 places from making the Happiness choir. The results are normally posted online, but the directors decided to call Renee to give her advance notice that K.S. had not made either choir. Before calling Renee, however, the directors met with Klein and a district autism consultant, and both of them closely questioned the directors about the selection process to make sure K.S.'s disability was not a factor in her missing the cut for show choir.

Relations between Renee and the district deteriorated after Renee learned K.S. had not made the show choir, with Renee insisting that K.S. be placed in the Happiness varsity show choir, and that any attempt to exclude her was due to her disability and her race, as K.S. is biracial. Renee instituted 42 U.S.C. § 1983 civil

rights proceedings in federal district court asking for a temporary restraining order (TRO) and preliminary injunction to have K.S. placed in the Happiness show choir. In an attempt to end the dispute, the district offered Renee an unconditional offer to place K.S. in the Protégé show choir. Renee did not accept this offer. The district court[4] held a hearing and at the hearing's conclusion, ruled orally from the bench, denying Renee's requested relief. The district court found there was no evidence that the decision regarding show choir had anything to do with K.S.'s disability. Nonetheless, in an effort to resolve the case before it proceeded to IDEA litigation, the school again offered to reinstate K.S. to the Protégé show choir, this time in exchange for Renee dropping an IDEA claim and any additional claims she had threatened to lodge against the district's teachers. Renee refused this offer as well.

K.S. last attended school May 18, the day the show choir results were publicized, and she eventually took her final exams off-campus.[5] During the summer months of June, July and August 2012 following her sophomore year, K.S. participated in the summer conditioning program for the school's volleyball team. She attended all mandatory practices as well as several optional practices, all of which were held at Kennedy. During this time, the volleyball coach and her individual paraprofessional reported that K.S. got along well with coaches and other students on the team. However, after an IEP meeting on August 16, 2012, the assistant volleyball coach noticed K.S. was upset, and K.S. reported to the assistant volleyball coach that K.S.'s mom didn't want her to go to Kennedy anymore.

The August 16, 2012, IEP meeting took place at Renee's request. Renee called many witnesses–consisting of K.S.'s family, friends, medical and counseling

[4]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

[5]Her cumulative GPA following her sophomore year was 4.024, placing her 40th out of 385 students in her class.

team–most of whom testified about the necessity of K.S. being placed in the Happiness show choir. The notes of that meeting, which the district acknowledges are not a verbatim transcript and may not have been exhaustive, indicate that Renee repeatedly advanced participation in the Happiness show choir as a necessary prerequisite to K.S. attending Kennedy in the fall. However, there is no indication that Renee informed the district officials that she was considering placing K.S. in a private school if her demands were not met. At the August IEP meeting, Renee also expressed concern that Klein had apparently taken a leave of absence and consequently, K.S. would be getting a new ASD classroom coordinator. Renee previously opined that Klein's leave of absence was in retaliation for the legal actions Renee had taken thus far against the district. Two "prior written notices"[6] were issued following the August 16 meeting, one addressing the possibility that K.S. could take college courses, referred to as post-secondary enrollment options (PSEO) and the recognized need to gather more information about the propriety of taking this course of action. The second prior written notice addressed Renee's request for K.S. to be placed in the Happiness show choir, and the team noted that while extracurricular activities were not specifically required to meet K.S.'s disability-related educational needs, there were other musical extracurricular activities in which K.S. could participate. Thus, the result of the August 16 meeting was that the IEP team determined that K.S.'s needs were social skills, physical activities that reinforce skills, consistent routines, regular schedule, and challenging academic courses. The IEP team concluded that these needs could be met in ways other than her being placed in the Happiness show choir. The team also decided to further explore the PSEO options, and planned a follow-up IEP meeting to finalize the details of K.S.'s possible college courses and accordingly implement the new IEP.

---

[6]The IDEA requires prior written notice of any proposed change in the evaluation or educational placement of a child. 20 U.S.C. § 1415(b)(3), (c).

In addition to the incidents already discussed herein, in early July 2012, Renee lodged an internal bullying complaint with the district that included the claim about the knife incident in January, and the altercation between K.S. and other students during the high school musical. Also included within this complaint was the claim that the district discriminated against K.S. by refusing to place her in show choir. The school investigated the complaint, and in a letter dated August 18, the district issued its determination that officials had responded appropriately with an investigation of the knife incident and other altercations, and that there was no discrimination related to the show choir decision. On August 20, Renee notified the school she was withdrawing K.S. from Kennedy immediately. She thereafter filed a due process complaint with the Iowa Department of Education, seeking tuition reimbursement for her placement of K.S. at the Grove School, a specialized school in Connecticut which exclusively serves students similar to K.S. Because K.S. was no longer enrolled, a follow-up meeting with the IEP team never took place.

A due process hearing was held over a three-day time-frame in October 2012, and the ALJ issued a decision in favor of the district in December 2012. Following the conclusion of administrative proceedings, Renee filed the instant action in Iowa state court seeking review of the administrative order and the district removed the case to federal court. The federal district court determined that the district had not failed in its duty to provide a FAPE and denied the petition for review.

## II. DISCUSSION

The IDEA requires all local educational agencies receiving federal funds to establish procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). A party challenging whether a FAPE has been provided may file an administrative complaint, which entitles them to receive an "impartial due process hearing" before a local or state

-8-

educational agency. Id. § 1415(b)(6), (f). After the hearing officer renders a decision, the aggrieved party may seek review of that decision by bringing an action in federal district court, which reviews the administrative record and any additional evidence requested by the parties. Id. § 1415(i)(2). The district court must make its decision independently, based on a preponderance of the evidence, as to whether the IDEA was violated. Pachl v. Seagren, 453 F.3d 1064, 1068 (8th Cir. 2006). This review is not necessarily de novo, however, and the court must give "due weight" to the administrative proceedings and should not substitute its judgment for that of the school officials. Id. (quotation omitted). "Because judges are not trained educators, judicial review under the IDEA is limited." Id. (quotation omitted)

In order to get reimbursement for a private placement, two requirements must be established: that the school failed to provide a FAPE; and that the private school is an "appropriate" placement within the meaning of the IDEA. Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 242-43 n.9 (2009); Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985). The school is not required to provide an optimal experience for a student with a disability, but instead must simply provide the student with a FAPE consistent with the IEP. Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 198-200 (1982). The IEP is a written document that sets out the child's present educational performance, establishes short and long term goals for improvement, and describes the specially designed services available to the child to help her achieve these goals. 20 U.S.C. § 1414(d); Honig v. Doe, 484 U.S. 305, 311 (1988). The IEP must be developed and reviewed annually, 14 U.S.C. § 1414(d)(4)(A)(i), in a manner that is reasonably calculated to enable the child to receive academic benefits. T.F. v. Special Sch. Dist. of St. Louis Cty., 449 F.3d 816, 820 (8th Cir. 2006). Academic progress is an "important factor" among others in ascertaining if the IEP was so calculated. CJN v. Minneapolis Pub. Sch., 323 F.3d 630, 642 (8th Cir. 2003) (quotation omitted). The burden of proof in an administrative hearing challenging an IEP is on the party seeking relief. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 61-62 (2005).

Renee argues that the IEP, written in January 2011, was not adequately updated to meet K.S.'s needs for the 2012-2013 academic year. Renee alleges that the district did not conduct a genuine review in August 2012 to address K.S.'s needs for the upcoming school year; that there was a serious risk that K.S.'s placement at Kennedy for the Fall 2012 semester would have triggered a "downward spiral" in her emotional health, including a suicide risk; and, finally, that K.S. needed a more intensely therapeutic environment than Kennedy could offer. The district counters that the IEP, as put in place in January and February 2012, and modified and evaluated in May and August 2012 respectively, complied with the procedural requirements of the IDEA and was reasonably calculated to provide K.S. with some educational benefit.

To the extent Renee contends that the district failed to comply with the procedural requirements of the IDEA by failing to conduct an annual review mandated by 20 U.S.C. § 1414, this argument is without merit. First, Renee expressly stated on the record to the ALJ that she had no procedural objections to the February 2012 IEP meeting–because of the unusual circumstances surrounding the rape and the resulting court proceedings, her family could not participate in the February IEP meetings. And there is no dispute that a majority of the IEP team members met in February 2012. Despite Renee's absence from that meeting, the team considered her stated concerns. The IDEA does not require officials to *revise* the IEP on an annual basis; they simply must *review* it. 20 U.S.C. § 1414(d)(4).

Renee cites to E.S. v. Katonah-Lewisboro Sch. Dist., 742 F. Supp. 2d 417, 442 (S.D.N.Y. 2010) and Anchorage Sch. Dist. v. M.P., 689 F.3d 1047, 1056 (9th Cir. 2012) for the proposition that schools cannot meet their obligations under the IDEA by "recycling" an old IEP or otherwise postponing its duty to revise the IEP. Katonah-Lewisboro is factually distinguishable as it involves a student who, after being in public school with an IEP, went to a private school for a year. When he was deciding where to return for the next year, his family took into account the fact that the public

school did not revise its earlier IEP based upon the time the student spent at private school. 742 F. Supp. 2d at 439-40.

Anchorage is also inapposite. There, after the parents refused to attend an IEP meeting, the school made a unilateral decision to postpone further attempts to update the IEP, and the student ultimately regressed the following year. Anchorage, 689 F.3d at 1052. Here, the district and Renee made a mutual decision in January 2012 to postpone the annual review of K.S.'s IEP in order to provide the stability her health care providers had recommended and to allow her to participate in the criminal court process. Significantly, the district did not ignore its affirmative duty regarding the IEP, but rather, met in February 2012 to formally address K.S.'s IEP. Although there is evidence K.S. continued to experience behavioral changes in early spring of 2012, the school district responded to the changes it was aware of during a meeting on May 2, 2012, and subsequently amended the IEP to allow for paraprofessional support in K.S.'s extracurricular activities. While K.S. experienced understandable setbacks as a result of the January 2012 rape, she also made significant progress during the spring semester, including better attendance and high grades–until she was not chosen for the show choir. Even still, after the show choir incident, the evidence indicates that K.S. had made significant progress in volleyball during summer workouts, including getting along with her peers in the volleyball program.

With regard to the substance of K.S.'s IEP, Renee contends that the emotional changes that K.S. underwent from January 2012 to August 2012 warranted more than simply minor changes to the IEP. Thus, she argues, as of the Fall 2012 semester, the district's educational offer was not appropriate. As evidence of this shortfall, Renee points to K.S.'s increased self-mutilation, her practice of isolating herself from her peers, and an overall deterioration of her mental health. The district concedes that no changes were made in February 2012, and only minor ones were made in May and August 2012, but notes that the behaviors pointed out by Renee were not new behaviors for K.S. K.S.'s attendance was down shortly after the rape, but improved

-11-

after the court proceedings subsided. The district advanced that the primary reason K.S. withdrew from school on May 18 was due to the show choir decision. Further, the IEP team worked closely with K.S.'s medical team and implemented the team's recommendations and advice during the time period following the rape. Those recommendations were the impetus for leaving the IEP intact without revision in February 2012 because the medical team recommended that K.S. remain in as consistent a routine as possible during the aftermath of this terribly traumatic incident.

Given all of the foregoing, we agree that the district was providing appropriate educational opportunities for K.S. at the inception of the Fall 2012 semester. Renee's complaints–that K.S.'s placement at Kennedy for the Fall 2012 semester likely would have triggered a "downward spiral" in her emotional health, and that K.S. needed a more intensely therapeutic environment than Kennedy could offer–do not carry the day in this IDEA litigation. This case is, unfortunately, not about what is the ideal placement for K.S. Our analysis is whether the district was providing K.S. with a FAPE at the time she was removed from the school. Or perhaps more pertinently, whether Renee has proven the district was *not* providing K.S. a FAPE at that time. We find that she has not met that burden, because the IEP advanced by the district was providing K.S with "some educational benefit" as of August 2012 when Renee unilaterally removed her from the district. Although certainly not dispositive in this kind of case wherein the goals in the IEP were non-academic in nature, K.S.'s academic progress further undermines the contention that K.S. was not receiving an educational benefit by virtue of the IEP in place when K.S. was removed from the district. See CJN, 323 F.3d at 642 ("Where . . . the record indicates that a student's behavioral problems, if unattended, might significantly curtail [her] ability to learn, the fact that [s]he is learning is significant evidence that [her] behavioral problems have, at least in part, been attended to.").

And, as the ALJ held following an exhaustive review of the relevant medical, psychological, and educational witnesses, there was simply not enough evidence that

-12-

K.S. was unable to return to Kennedy in August 2012, or that returning would cause her severe and lasting psychological harm, as alleged by Renee. Many of Renee's expert witnesses at the due process hearing who opined about such harm had not communicated with the district personnel who spent time observing K.S. at Kennedy while K.S. participated in volleyball over the summer months. One of Renee's expert witnesses admitted that she did not know that K.S. had, in fact, spent a good number of days in the Kennedy school building over the summer months. Indeed, Renee and her witnesses spent a substantial amount of time at the August 16 IEP meeting advocating that K.S. *should* return to Kennedy and be placed in the Happiness show choir. The ALJ further found, and we agree, that each incident of bullying that was reported to the school was promptly investigated and resolved, and the district presented substantial evidence refuting the claim that K.S. was subjected to ongoing bullying or harassment. K.S.'s one-on-one paraprofessional who accompanied K.S. nearly every day of the 2012 spring semester testified at the due process hearing that she never witnessed K.S. being bullied by other students, nor did K.S. report to her that K.S. had been bullied.

Renee argues that she met her burden of proof in part because she presented a consensus of medical and psychological experts at the due process hearing, while the school only presented district employees such as the paraprofessional, the special education director, and the principal. Having fully reviewed the transcript of the due process hearing, we find that while the district employees were certainly not medical experts, they knew K.S. very well, and the one-on-one paraprofessional was especially well acquainted with K.S.'s emotional health over the critical summer 2012 timeframe. Klein also knew K.S. exceedingly well and spent a great amount of time with K.S. through May 2012. In fact, it seems to have been Klein's decision to take a leave of absence for the Fall 2012 semester that so concerned Renee that Renee called for the August 16 IEP meeting. The district employees did not attempt to give inappropriate medical testimony about K.S.; instead, they offered professional observations based upon actual and ongoing contact with K.S. regarding her educational and social

-13-

performance in a variety of school settings. The ALJ carefully considered all of this testimony, and we give the ALJ's findings "due weight." K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 803 (8th Cir. 2011) (quotation omitted). Given these circumstances, we decline Renee's request to rule in her favor simply based on the sheer number of experts she compiled compared to the district.

Although Renee now focuses on the IEP and whether the district was adequately meeting K.S.'s needs via the content of the IEP, it is abundantly clear from reading the entirety of the administrative record that Renee's focus, until the time she unilaterally pulled K.S. from the district, was getting K.S. into show choir–and not just any show choir, as the district made an unconditional offer in July 2012 to place K.S back into the Protégé show choir. The case was litigated in federal district court in a quest for a TRO, and at the school district level, with the nearly singular focus that K.S.'s educational needs could only be met by placing her in the Happiness show choir. Although there is not a written transcript of the August 16 IEP meeting, the notes and testimony support the ALJ's finding that Renee and her witnesses spent a "substantial portion" of that meeting advocating for K.S. being placed in Happiness, rather than advocating for many, if any, specific substantive changes to the IEP. In fact it appears from those meeting notes that Renee's primary requested change to the IEP was a proposal that K.S. be placed into the Happiness show choir. Given all of the opportunities and resources available to K.S. via the IEP and other extracurricular activities at Kennedy, we find that the district's refusal to override the show choir audition process and unilaterally require the show choir director to place K.S. in the Happiness show choir did not deny K.S. a FAPE.

## III.  CONCLUSION

Accordingly, we affirm the judgment of the district court.

_____