Madison MEARES

v.

RIM OF THE WORLD UNIFIED
SCHOOL DISTRICT.

Case No. EDCV 15–2096 JGB (SP)

United States District Court,
C.D. California.

Signed September 2, 2016

Acrivi Coromelas, Dan Stormer, Brian D. Olney, Hadsell Stormer and Renick LLP, Pasadena, CA; for Madison Meares.

Julie A. Mullane, Nancy Ann Mahan-Lamb, Gary Robert Gibeaut, Gibeaut Mahan and Briscoe, Los Angeles, CA, Vivian Elaine Billups, Vivian E. Billups Law Offices, Brea, CA, for Rim of the World Unified School District.

**Proceedings: Order AFFIRMING IN PART and REVERSING IN PART the July 15, 2015 Decision by the Office of Administrative Hearings (IN CHAMBERS)**

The Honorable JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

This case involves a dispute over a school district's obligations towards a disabled child, Plaintiff Madison Meares, under the Individuals with Disabilities and Education Act, 20 U.S.C. §§ 1400–1491. Plaintiff, by and through his educational decision-maker and mother, Kim Meares, appeals the decision by the Office of Administrative Hearings that Rim of the World Unified School District provided Plaintiff with a free appropriate public education ("FAPE") under the Act. In brief, Plaintiff argues that the District's refusal to provide him with a male one-to-one aide and a competent male mountain biking aide deprives Plaintiff of a FAPE and denies him full and equal access to public services.

After consideration of the papers filed in support of, and in opposition to, Plaintiff's Appeal of Administrative Decision and the arguments of counsel presented at the August 29, 2016 hearing, the Court AFFIRMS in part and REVERSES in part the decision by the Office of Administrative Hearings.

## I. BACKGROUND

Plaintiff Madison Meares ("Plaintiff") is a twenty-one-year-old student diagnosed as being on the autism spectrum. First Amended Complaint ("FAC") ¶ 18.[1] At all relevant times, Plaintiff resided within the boundaries of Rim of the World Unified School District ("Defendant" or "the District") and has been, and continues to be, enrolled in the District's special education program. FAC ¶ 3. Plaintiff expects to remain so enrolled until he ages out at the age of twenty-two. Id.

### A. Procedural History

In November 2013, Plaintiff filed a Due Process hearing request with the Califor-

---

1. The FAC states that Plaintiff was twenty when the FAC was filed in April 2016. FAC ¶ 3. However, the FAC also states that Plaintiff turned eighteen on February 28, 2013, see ¶ 18, which would make him twenty-one today and when the FAC was filed.

nia Office of Administrative Hearings ("OAH"), arguing that the District materially failed to implement his 2012 Individualized Education Plan ("IEP"). Id. at ¶ 12. On March 10, 2014, Administrative Law Judge Marian Tully issued a decision holding, as relevant to the instant action, that the IEP did not require the District to provide either a mountain biking aide able to keep pace with Plaintiff or a male one-to-one aide. Id. On August 13, 2015, this Court affirmed her decision, although it did not reach the issue of whether the absence of such a requirement in the IEP rendered it legally insufficient. Id. That is the issue raised in the instant appeal.

In January 2015, the District prepared Plaintiff's annual IEP, which did not provide for either a male one-to-one aide or a competent male mountain biking aide. FAC ¶ 13. After Plaintiff objected to the IEP, Defendant initiated a second Due Process hearing in front of the OAH. Id. at ¶¶ 14, 15. Administrative Law Judge Cole Dalton ("ALJ Dalton") presided over the four-day hearing on May 26, 27, 28, and June 10, and issued a decision on July 15, 2015 finding Plaintiff's IEP substantively adequate. OAH Decision ("Decision"), Excerpts of Record, Dkt. No. 34–1.

On June 27, 2016, Plaintiff filed an appeal, seeking to reverse the Decision. "Appeal," Dkt. No. 34. The District filed its Opposition on July 25, 2016. "Opp'n," Dkt. No. 35. Plaintiff filed his Reply on August 15, 2016. "Reply," Dkt. No. 36.

On August 24, 2016, the Court issued an order giving the Parties leave to submit supplemental briefing on the scope of the District's obligations under IDEA's implementing regulations. Dkt. No. 38. Plaintiff submitted a supplemental brief on August 26, 2016. "Pl. Supp.," Dkt. No. 40.

On August 29, 2016, the Court held a hearing on Plaintiff's Appeal and considered the arguments of counsel.

## B. The OAH Decision

In reaching his conclusion that the District's IEP offered Plaintiff a FAPE—despite the exclusion of a competent mountain biking aide or a male one-to-one aide—ALJ Dalton considered the testimony of:

- Recreation instructor Jack Cooperman ("Mr. Cooperman");
- District mountain biking coach and physical education teacher Scott Craft ("Mr. Craft");
- District speech language pathologist Tammy Hopkins ("Ms. Hopkins");
- District special education instructional aide Jonathan Hunter ("Mr. Hunter");
- Plaintiff's mother, Kim Meares ("Ms. Meares");
- Recreation instructor Tom Peirce ("Mr. Peirce");
- District security aide and mountain biking aide Charles Purinton ("Mr. Purinton");
- District special education instructional aide Audra Scopen ("Ms. Scopen");
- District assistant principal Derek Swem ("Mr. Swem");
- District specialized academic teacher Tina Thompson ("Ms. Thompson");
- District physical education teacher Robert Turner ("Mr. Turner");
- District behavior specialist Carol Unterseher ("Ms. Unterseher"); and
- District occupational therapist Jo Ann Vargas ("Ms. Vargas").

Notice of Lodging Administrative Record from OAH, Volume 1 ("AR Vol. 1") at 178, 182, Dkt. No. 23–1.

The Decision first reviewed the terms of the IEP to which Plaintiff objected,

and whose sufficiency is the subject of this Appeal. Id. at 4–6. The IEP offered Plaintiff specialized academic instruction services for three periods per day and three classes in the general education class (that included supplemental aids and services), which would give him a 50% special education placement and a 50% general education placement. January 13, 2015 Individualized Education Program Data Summary ("2015 IEP"), Excerpts of Record ("ER") at 012, Dkt. No. 34–1. The IEP also offered weekly speech therapy classes (both in a group and as individual therapy), weekly behavior intervention therapy, and a full-time one-on-one aide. Id. at 013. These services were offered as part of implementing seven goals identified by the IEP in the areas of social language, expressive language skills, comprehension, functional math, and positive self-regulation behavior. Id. at 008–011.

ALJ Dalton then credited Ms. Vargas' testimony that Plaintiff's sensory needs were being met—and could continue to be met—through the District's proposed IEP. OAH Decision at 9. Vargas explained that District staff were able to carry out the use of "sensory strategies," such as hand fidgets, providing movement opportunities such as walking the track or doing lunges, using one step commands, touching Plaintiff on the shoulder, and using a lower tone of voice. Id. at 4–5, 9; AR Vol 2 at 99.[2] She explained that such strategies "soothed" Plaintiff and enabled him to "work through mood changes so that he could attend, be calm, listen to instruction, and interact appropriately with his educational environment." Id. at 4. Ms. Vargas further testified that, according to input from both

Plaintiff's teacher and his one-to-one aide, he "responded well to direction" and "did well with hand fidgets and movement breaks." Id.

ALJ Dalton further relied on the testimony from Ms. Scopen, who was Plaintiff's one-to-one aide during the 2013–2014 school year, as well as during the 2014–2015 school year until February 2015. Id. at 10. She noted that Ms. Scopen had received training in autism and behavior intervention, and found that she was successful in helping Plaintiff regulate his behavior through such strategies as using a hand fidget device, redirection, prompting, and standing in close proximity to him. Id. at 10. She also took him out of class when he showed signs of elevated emotions and directed him in activities such as bouncing a ball, kicking a soccer ball, or walking the track. Id. at 10. These activities successfully helped Plaintiff "de-escalate" in moments of stress and regulate his behavior. Id.

As well, ALJ Dalton noted that there were four behavioral incidents reported between June 2014 and the annual IEP meeting on January 13, 2015. In each incident, she noted Plaintiff's female aide "was able to de-escalate [Plaintiff] using the sensory and behavior strategies developed by the team." Id. at 4. She also concluded that "[t]he incidents did not reflect a pattern of inappropriate behavior directed at females." Id.

Finally, ALJ Dalton credited the testimony of Mr. Turner regarding Plaintiff's participation in physical activity. Id. at 9. Mr. Turner worked as athletic director and oversaw Plaintiff's participation in the

2. Ms. Vargas' testimony from the hearing includes some additional strategies not noted in the OAH decision. For example, Ms. Vargas testified that there were "different systems in place to address the sensory needs," including "having weighted materials," for example, a weighted blanket or a pillow weight, and providing "one step directions." AR Vol. 2 at 77, 99. Plaintiff's aide Ms. Scopen also used physical "prompts"; that is, she'd employ a gesture for Plaintiff to mimic, which would help him stay still. AR Vol. 3 at 69–70.

mountain biking club. Id. Mr. Turner testified that Plaintiff "was able to participate in regular education with his one-on-one aide," noting that Plaintiff participated successfully in basketball and badminton and "was able to address [his goals] during regular physical education. Id. at 8–9.

On the basis of the above, ALJ Dalton found that Plaintiff "did not require after-school services in the form of mountain biking with a male one-on-one aide." Id. at 15. She found that the evidence indicated that Plaintiff "did very well in physical education" and that "physical activity remained an integral part of the strategies used to provide emotional regulation" throughout his school day. Id. She further found that Ms. Scopen's successful relationship with Plaintiff and her proficiency in applying appropriate behavioral interventions to provide sensory regulation "persuasively showed" that Plaintiff did not require a male one-on-one aide. Id.

## C. Plaintiff's Appeal

Plaintiff disputes ALJ Dalton's characterization of the factual record. While Plaintiff does not contest the substance of the IEP, he argues that ALJ Dalton failed to consider various incidents of inappropriate conduct with female staff. Appeal at 2. He further argues that ALJ Dalton "ignores a raft of testimony identifying the myriad and profound ways in which [Plaintiff] benefited emotional, socially, and psychologically" from his participation in mountain biking. Id.

In support of his contention that he requires a male aide, Plaintiff points to several instances of inappropriate behavior with female aides:

- In September 2011, he touched the breast of female aide Keelee Dafnis, after which the District assigned him to temporary male aide. Appeal at 3, OAH Hearing Transcript, ER at 195, Dkt. No. 34–2.
- On June 9, 2014, he violently grabbed Ms. Scopen by the arm. Appeal at 5; ER at 075.
- On September 30, 2014, he threw a punch at Ms. Scopen. Appeal at 5; ER at 080.
- On December 9, 2014, he grabbed a female staff member's arm "extremely tight[ly]." Appeal at 5; ER at 076–078.
- In December 2014, he threw a water bottle at Ms. Scopen, whereupon she called security. Appeal at 5; ER at 131.
- On February 5, 2015, he touched himself inappropriately, "thrust himself" into Ms. Scopen a couple of times before she was able to slip out from his grasp, punched Ms. Scopen in her arm, and attempted to force her arm toward his groin "with a pretty firm grip." Appeal at 6; ER at 136.[3]
- On February 25, 2015, he hit Ms. Thompson's hand with his fist. Appeal at 7, ER at 073.[4]

3. After the February 5 incident, the District assigned Plaintiff a male aide, Jonathan Hunter. Appeal at 7. However, it did not include a male aide as part of Plaintiff's IEP, so Plaintiff has no assurance that the District will not once again place him under female supervision going forward. Id.

4. The Court notes that Plaintiff's Appeal leaves out instances of violence and aggression around male aides and staff. For example, on October 20, 2014, he hit another student with a fist after a male staff member had joined him in the locker room. See ER at 079. And on May 6, 2015, he grabbed his male aide's sleeve "in an aggressive manner" three times. See id. at 075. Plaintiff's aide Mr. Purinton also testified that Plaintiff had once attempted to strike him "with a kind of fist." AR Vol. 3 at 235–36. Furthermore, Plaintiff's

He contends that these incidents have disrupted his education by interfering with his instruction. Appeal at 13. For example, Plaintiff was suspended for two days after he made sexual advances on Ms. Scopen. Id.; ER at 116. As well, Plaintiff explained that the District's assignment of a female aide has led to other problems. For example, his female aides have been unable to supervise him when he changed clothes in the locker room prior to and following gym class. Appeal at 5; ER at 138. As a result, Plaintiff was supervised only by other students while in the locker room—this, despite the fact that Plaintiff has a history of behavioral problems in the locker rooms and bathrooms, including eating from trashcans and failing to put on pants. Appeal at 5, ER at 39–40, 148–50. Finally, Plaintiff points to testimony that, in general, he was "much more responsive" and better at following instructions from male authority figures. Appeal at 6; ER at 206; AR Vol. 3 at 412.[5]

With regard to the benefits of mountain biking, Plaintiff points to testimony from Mr. Craft (the coach for the mountain biking team), Mr. Peirce (one of Plaintiff's instructors at an out-of-school recreation center providing access to sports for persons with disabilities), and Mr. Cooperman (another instructor from the recreation center). Both Mr. Peirce and Mr. Cooperman testified to observing Plaintiff improve in his ability to listen and follow directions while participating in athletic activities. Appeal at 8; ER 199–200, 211. During the hearing, Mr. Cooperman more specifically testified as to the emotional benefits that Plaintiff incurred from athletics, explaining, "I see [Plaintiff] when he's not doing something—you know—curled up in a shell, either scripting to himself, maybe sometimes a small rocking motion. But when he gets involved, I can see his involvement in it and—like in water skiing or other things, he will take his own course and he feels confident in it ... And you can just see his temperament just become more open and more pleasant. You can feel it around him and his anxiety things are gone." AR Vol. 3 at 409.[6] Mr. Peirce's testimony echoed Mr. Cooperman's: after engaging in outdoor sports, "[Plaintiff] just doesn't show that same level of anxiety that he sometimes displays when he's not—you know—when he's not engaging in outdoor sports ... [H]e's a lot more mild mannered, more directable, less anxious." Id. at 385.

In turn, Mr. Craft testified as to Plaintiff's participation specifically on the school

---

account does not acknowledge the evidence that female aides had previously been successful in calming him after aggressive episodes. For example, Ms. Scopen testified that after the incident in which Plaintiff threw a water bottle at her, she let him walk around the classroom and then calmed him down by giving him his book. See ER at 131. However, there seems to be no dispute that Plaintiff's inappropriate *sexual* behavior was never directed towards male aides.

**5.** Specifically, Plaintiff's mother testified that he is more "volatile" with her than with his father, and expressed her belief that Plaintiff may pose a security risk to female aides. AR Vol. 3 at 368. Mr. Peirce also testified that Plaintiff was "much more responsive to male instructors" and explained that, at the nonprofit recreation center for persons with disabilities, they "pretty much exclusively use male coaches" to work with Plaintiff for this reason. Id. at 392. Finally, Mr. Cooperman testified as to Plaintiff's positive interactions with male instructors, and explained that "when I've been able to talk at Madison, I don't repeat myself and he reacts to the direct instructions I give him," in contrast to his difficulty accepting instructions from female authority figures. Id. at 412–13.

**6.** However, the Court notes that neither Mr. Peirce nor Mr. Cooperman ever observed Plaintiff in the school context, nor in the context of the school's mountain biking team. AR Vol. 3 at 396–99, 418–19.

mountain biking team. Mr. Craft extolled the benefits of the mountain biking team for "everybody," though he cautioned that he "[didn't] know enough about autism" to testify as to the benefits of mountain biking for assisting Plaintiff specifically "in dealing with his autism." ER at 181. Notwithstanding this caveat, he agreed—or at least, did not dispute—that mountain biking helped Plaintiff learn "teamwork, socialization, overcome adversity, life skills, moods management, [and] exercise." Id. at 182.[7] However, he did not know if Plaintiff's behavior changed once he left the biking team. Id. Plaintiff's mother, Ms. Meares, testified more confidently about the effect on him of being on the mountain biking team: she testified that learning to compete with the team "helped him with ... facing challenges and problem solving" and helped develop his social skills. Id. at 168. She further testified that participation on the team also helped stabilize his moods. Id. at 169.

However, Plaintiff pointed out that to be on the team and to achieve these benefits, he requires a capable one-to-one aide able to keep pace with him. Appeal at 9. Without an aide who can keep up with him, he argues, he could easily get lost—as in fact happened when Plaintiff rode with an aide unable to keep pace with him in 2012. Id.

In Plaintiff's view, ALJ Dalton's failure to consider the evidence raised above undermines her conclusion that the District has adequately provided Plaintiff with a FAPE. In the alternative, Plaintiff argues that, *even if* providing Plaintiff with a FAPE did not require offering him a competent mountain biking aide, such an obligation is imposed through the IDEA's

equal opportunity requirement. Namely, Plaintiff argues that school districts must ensure disabled and nondisabled students an equal opportunity to participate as their nondisabled peers—and that failing to provide him with a mountain biking aide deprives him of this right. Appeal at 18–19.

## II. LEGAL STANDARD

Under Section 1415(e)(2) of the IDEA, a district court reviewing a state administrative decision shall base its decision "on the preponderance of the evidence." 20 U.S.C. § 1415(e)(2). The Ninth Circuit has interpreted this as calling for de novo review of the appropriateness of an education program. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994); see also M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 642 (9th Cir. 2005) ("We review de novo whether a school district's proposed IEP provides a FAPE under the IDEA."). However, it has cautioned that federal courts must give "due weight" to judgments of education policy in reviewing state hearings and "should not substitute their own notions of sound educational policy for those of the school authorities which they review." Smith, 15 F.3d at 1524 (internal quotation marks omitted). This cautionary approach is reiterated by the Supreme Court, which warned in 1982, "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state

---

7. In Mr. Craft's testimony from the OAH hearing, he emphasized that he "[didn't] feel that [he had] the expertise with autism to decide" whether Plaintiff's education benefited from his participation in mountain biking.

AR Vol. 3 at 253. He explained that "[his] expertise is physical education" and that he could only speak generally in recommending physical activity to "anybody." Id.

decisions at nought." <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

Thus, the standard of review has been characterized as "modified de novo review," because, although the court may decide questions of law and fact, it should afford deference to the state's "specialized knowledge and experience," particularly where ALJ findings are "thorough and careful." <u>Ashland Sch. Dist. v. Parents of Student, E.H.</u>, 583 F.Supp.2d 1220, 1222–23 (D. Or. 2008), <u>aff'd</u>, 587 F.3d 1175 (9th Cir. 2009). Ultimately, the degree of deference due to the ALJ is largely "a matter for the discretion of the courts." <u>Gregory K. v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1311 (9th Cir. 1987).

■ Furthermore, in an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision. <u>L.M. v. Capistrano Unified Sch. Dist.</u>, 556 F.3d 900, 910 (9th Cir. 2009); <u>see also</u> <u>C.L. v. Lucia Mar Unified Sch. Dist.</u>, No. CV 12-9713 CAS PJWX, 2014 WL 117339, at *2 (C.D. Cal. Jan. 9, 2014), <u>aff'd sub nom. C.L. ex rel. V.L. v. Lucia Mar Unified Sch. Dist.</u>, 646 Fed.Appx. 524 (9th Cir. 2016) (same). Accordingly, Plaintiff here bears the burden of showing that the ALJ's decision does not deserve deference, and that the preponderance of the evidence shows that the District's IEP does not provide a FAPE under the IDEA.

## III. DISCUSSION

Plaintiff argues both that the District's IEP failed to provide him with a FAPE, and that, by failing to offer Plaintiff a mountain biking aide, the District unlawfully discriminated against him by depriving him of an equal opportunity to participate in extracurricular activities. Appeal at 1. The Court discusses each in turn.

## A. FAPE

As stated in the IDEA itself, a primary purpose of the Act is to assure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. § 1400(c). Under the Supreme Court's 1982 decision interpreting this provision of the Act, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The Supreme Court concluded that states must provide a "basic floor of opportunity" to disabled students, and that Congress "did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." <u>Rowley</u>, 458 U.S. at 197, 102 S.Ct. 3034; <u>see also</u> <u>J.L. v. Mercer Island Sch. Dist.</u>, 592 F.3d 938, 947, 951 (9th Cir. 2010) (citing <u>Rowley</u> as to standards governing FAPE and holding that <u>Rowley</u> remains binding precedent).

### 1. Plaintiff's request for a male one-to-one aide

■ Plaintiff argues that the District's refusal to include a male one-to-one aide in his IEP denies him FAPE, and that ALJ Dalton's failure to acknowledge his pattern of aggression towards female aides renders her decision deficient. Appeal at 1, 16. In response, the District argues that the IEP's inclusion of counseling to address "maladaptive behaviors" was "more appropriate and effective than a blanket exclusion of female employees." Opp'n at 5.

Defendant's argument mischaracterizes Plaintiff's position. Plaintiff is not contesting that the tools and strategies included in the IEP may be helpful, nor demanding that *every* employee who works with Plaintiff be male. Rather, Plaintiff points out—as supported by the testimony of various witnesses—that he has a well-documented pattern of responding more appropriately to male staff members—and concludes that assigning him to a female one-on-one aide was not reasonably calculated to enable him to receive the educational benefits to which he was entitled.

A District of Hawaii case is instructive on this point. In D.S. ex rel Clarenore S. v. Dep't of Education, No. CIV. 12-00533 DKW, 2013 WL 6047200 (D. Haw. Nov. 14, 2013), the District Court considered whether a district's failure to consider a student's "very troubling sexualized behaviors" towards female staff members invalidated its IEP. Noting that the information about these sexualized behaviors had been conveyed to the staff, the court found that "it was not objectively reasonably to disregard this information and neglect to incorporate a plan to address these new behaviors within the IEP." Clarenore S., 2013 WL 6047200 at *5–6. Accordingly, it reversed the ALJ's decision because the failure to acknowledge escalating sexual behaviors was a "substantive denial of FAPE." Id. at *7.

Here, the complete administrative record reveals at least two instances of inappropriate sexualized behavior directed towards female aides—first in September 2011 and more aggressively in February 2015, when Ms. Scopen had to struggle to break free from his grip—and various additional instances of aggression towards female aides. As well, at least three witnesses—Mr. Cooperman, Mr. Peirce, and Ms. Meares—testified that Plaintiff was more responsive to instruction from male staff members. Furthermore, the District does not dispute that, because female aides could not enter the male locker room, Plaintiff was often left alone—"supervised" only by other students—in the locker room, despite his history of behavioral problems when unsupervised.

Despite this, as in the case of Clarenore, the IEP does not specifically address Plaintiff's inappropriate sexual or aggressive behavior towards women in particular. Furthermore, although ALJ Dalton heard testimony about this behavior, as well as testimony about Plaintiff's greater responsiveness towards male staff members and about the problems involved in leaving Plaintiff unsupervised in the locker room, the OAH decision is notably silent on all of these issues. To the extent that ALJ Dalton made any findings regarding the question of a male aide, she stated only that there were four instances of behavioral problems reported between June 2014 to January 2015, and that "these incidents did not reflect a pattern of inappropriate behavior directed at females." ALJ Dalton failed to cite to specific evidence on the record in reaching this conclusion. Id. Neither did she acknowledge Plaintiff's sexual aggression towards Ms. Scopen in February 2015, despite substantive testimony from Ms. Scopen on the issue. Id. Incredibly, ALJ Dalton concluded that there was "no showing that ... contact with female staff was sexually related." OAH Decision at 16.

While the District argues that the February 2015 incident was irrelevant to the IEP because it occurred after the IEP meeting in January 2015, see Opp'n at 6, the IEP had yet to be implemented in February and the District could—and should have—revised the IEP in light of the incident. See, e.g., K.K. ex rel. K.S.K. v. Hawaii, No. CIV. 14-00358 JMS, 2015 WL 4611947, at *2, *5 (D. Haw. July 30,

2015) (approving of school district's decision to update and re-draft IEP in light of traumatic incident that befell student *after* annual preparation of IEP). Furthermore, once a state is on notice of a potential flaw in the IEP, it is responsible for correcting it, even if doing so requires revisiting an already-drafted IEP. Marc M. ex rel. Aidan M. v. Dep't of Educ., Hawaii, 762 F.Supp.2d 1235, 1245 (D. Haw. 2011). Here, the conduct was sufficiently concerning—school administrators even referred to the incident as "sexual assault," Motion at 6, ER at 191, 110-11—that it should have alerted the District that the existing IEP was deficient and needed to be updated.

Furthermore, the evidence also indicated problems in terms of Plaintiff's relationship with female staff members that went beyond the February 2015 incident: namely, his tendency to respond more productively to male staff members and the inability of female aides to supervise him in the locker room. Yet ALJ Dalton acknowledges *none* of this in her opinion. Instead, she states only that "isolating [Plaintiff] to work only with male staff or only a male aide would impede his ability to successfully transition to post-secondary environments." OAH Decision at 16. She cites no authority for this proposition—and in fact, there is *no* evidence in the administrative record—whether in the form of testimony from a licensed education specialist or otherwise—that would support this claim.

The Court finds that the ALJ's failure to consider substantive evidence on the record, as well as her reliance on generalizations unsupported by the record, undermines a finding that her decision on this point was "thorough and careful" and therefore subject to special deference un-

der modified de novo review. See, e.g., Forest Grove Sch. Dist. v. Student, No. 3:12-CV-01837-AC, 2014 WL 2592654, at *12 (D. Or. June 9, 2014) (affording "little deference" to ALJ opinion where "legal analysis [was] largely unreliable because she was factually selective in her analysis and often ignored contradictory evidence"); see also Marc M. ex rel. Aidan M. v. Dep't. of Educ., Hawaii, 762 F.Supp.2d 1235, 1242 (D. Haw. 2011) (refusing to accord deference to hearing officer's decision where "nearly all of the Hearings Officer's conclusions of law are conclusory in nature and the Officer rarely cited to facts on the record to support his conclusions.")

Rather, based on the preponderance of the evidence standard, the Court finds that there was sufficient evidence on the record to establish that Plaintiff required a male one-to-one aide to prevent escalation of sexual behaviors, to provide for proper supervision in the locker room, and, according to the testimony from three witnesses that Plaintiff was more responsive to male authority, to provide for more effective instruction. By failing to provide for a male aide, the District's IEP did not offer a placement that met Plaintiff's "unique needs" under the IDEA, and thus denied Plaintiff a FAPE.

Accordingly, the OAH Decision is REVERSED as to Plaintiff's request for a male one-to-one aide. The Court ORDERS the District to provide for a male one-to-one aide in Plaintiff's IEP for the 2015-2016 academic year.[8]

## 2. Plaintiff's request for a competent mountain biking aide

Plaintiff argues that rigorous physical activity is critical to his welfare and edu-

---

8. At the hearing on August 29, the Parties explained that although Plaintiff turns twenty-two in February 2017, the District retains its obligations under the IDEA through the end of this academic year.

cation, and that mountain biking with the school team in particular provides important benefits for his social, educational, and psychological development. Appeal at 7–8. In response, the District reiterates the reasoning it laid out in its IEP: namely, that "[Plaintiff] does not need extracurricula [sic] programs to gain educational benefit from his special education program" and that his needs are being met through general education PE and the rest of the behavior plan outlined in the IEP. Opp'n at 35; AR Vol. 1 at 15.[9]

The OAH decision adopted the District's arguments. ALJ Dalton found that Plaintiff "did not require after-school services in the form of mountain biking with a male one-on-one aide ... in order to address his need for social skills and physical activity." OAH Decision at 15. She explained that "the evidence demonstrated that Student did not require access to social activities outside the school day in order to address his pragmatic social skills or need for physical activity. Student did very well in physical education and physical activity remained an integral part of the strategies used to provide emotional regulation to Student throughout his school day." Id.

This Court finds that the evidence supports the ALJ's conclusions. First, the testimony from witnesses did not indicate that participating on the mountain biking team was crucial to Plaintiff's development. The two recreation instructors—Mr. Peirce and Mr. Cooperman—who testified about the benefits of recreation for Plaintiff had never seen him participating with the school team and did not have any knowledge regarding Plaintiff's participation on the team. AR Vol. 3 at 396–99; 416–19. Furthermore, to the extent that their testimony addressed the emotional and social improvements they noticed in Plaintiff, such testimony focused on such benefits in the context of participating in athletics in general. See AR Vol. 3 at 385–87; 409 (discussing, for example, Plaintiff's positive reaction to water-skiing and snowboarding). On the other hand, the testimony of Mr. Craft, who was Plaintiff's coach on the mountain biking team, was less confident or conclusive as to the effect of mountain biking on Plaintiff. Mr. Craft substantially qualified his statements that Plaintiff specifically benefitted from mountain biking by emphasizing that he did not have the expertise to make this judgment, and that he could only speak generally in terms of recommending physical activity as good for "anybody." AR Vol. 3 at 253. Furthermore, he could not say whether Plaintiff's development or behavior suffered after he left the team. ER at 182.

Accordingly, the Court is left with the testimony from Plaintiff's mother, Ms. Meares. At the hearing, Ms. Meares stated that Plaintiff's participation in the bike club helped him in "facing challenges" and "problem solving" and "in terms of being more stable and less swings in mood." AR Vol. 3 at 196, 198. However, Ms. Meares—who is herself licensed as a professional ski instructor for persons with disabilities—also spoke more generally about physical activity being important for autistic indi-

---

9. The District also argues that Plaintiff could not get a mountain biking aide because he was not eligible for the team due to his age; the National Interscholastic Cycling Association ("NICA") requires all high school student-athletes to be nineteen or younger to be eligible to compete. Appeal at 8; AR Vol. 2 at 35. In the IEP, the District noted that "the team does not have resources to support a non-racing extra members [sic] as they are a Division II team limited to 12 members." However, because ALJ Dalton did not seem to rely on this reasoning in reaching her legal conclusions, see OAH Decision at 15, and because this issue may be resolved on other grounds, this Court does not reach this argument.

viduals. Vol. 3 at 185–86. She explained that Plaintiff participates with her family and through a non-profit recreation center in water skiing, snow skiing, snowboarding, wake boarding, sky skiing, and hiking. Id. at 182–83. She further noted that these activities help him "stay more regulated emotionally" and with his anxiety and depression. Id. at 188–89. Her testimony thus establishes that Plaintiff derives benefits from physical activity in general, and not that these benefits are limited specifically to mountain biking, nor specifically to mountain biking with the school team.

Furthermore, testimony from school professionals support the District's view that Plaintiff's needs and moods were—and are—regulated appropriately with the current IEP even without the provision of a competent mountain biking aide. Physical education teacher Mr. Turner explained that Plaintiff's physical needs were met through his class (for example, playing badminton or basketball), id. at 177, while licensed occupational therapist Ms. Vargas and specialized instructional assistant Ms. Scopen both testified as to the various additional physical activities that District staff would employ with Plaintiff to help him through his moods—for example, kicking soccer balls, throwing a ball back and forth with Ms. Scopen, doing "dot drills" (where Plaintiff jumped from dot to dot), walking around the track, or doing lunges, AR Vol. 2 at 77, 99; AR Vol. 3 at 67, 73, 76. And, as ALJ Dalton noted in her Decision, these types of "sensory strategies" were successful in calming Plaintiff and helping to regulate his emotions. Decision at 4; AR Vol. 2 at 55–57, 76–78; Vol. 3 at 93, 120.

Furthermore, the chronology of events undercuts Plaintiff's argument that participating on the mountain biking team with a competent aide was crucial to his development. Plaintiff notes that he did not partic-ipate on the team beginning in the 2014–2015 school year. Appeal at 10–11. Yet in January 2015—Plaintiff's first year not on the team—Ms. Meares stated at his IEP meeting that "this year was much better . . . compared to last year." AR Vol. 1 at 14.

Plaintiff also points to the fact that he started greeting Mr. Pierce by name—a big change for him—as evidence that participation on the mountain biking team promoted his social development. Appeal at 8. However, this change does not correlate neatly with his participation on the mountain biking team either: Mr. Pierce testified that Plaintiff began greeting him by name at some point in late 2013, and that he has continued to do so to date—long after Plaintiff left the mountain biking team. AR Vol. 3 at 393–94.

Altogether, these facts suggest an analogy with Sneitzer v. Iowa Dep't of Educ., 796 F.3d 942 (8th Cir. 2015), where the Eighth Circuit considered the request of an autistic student that her IEP provide for her participation in the school choir. Despite the student's argument that she was suffering a deterioration of her mental health and that her emotional needs could only be met by joining the school choir, the court found that the district's refusal to unilaterally require the show choir director to place the student in the choir did not deny her a FAPE. Sneitzer, 796 F.3d at 949–51. Rather, the court noted that the IEP provided by the district was providing her with "some educational benefit" to satisfy its requirements under the IDEA where the district provided her with one-on-one paraprofessional support throughout the school day and provided for a reduced assignment load for several classes. Id. at 944. The court explained, "This case is, unfortunately, not about what is the ideal placement for [the student]. Our analysis is whether the district

was providing [her] with a FAPE." Id. at 950. This approach—which looks at whether the school's plan is appropriate, not whether it is ideal—has been reaffirmed by the Ninth Circuit, which explained, "an 'appropriate' public education does not mean the absolutely best of 'potential-maximizing' education for the individual child." Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1314 (9th Cir. 1987). Ultimately, the test under FAPE is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits. Rowley, 458 U.S. at 203–04, 207, 102 S.Ct. 3034; see also Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 30 (1st Cir. 2008) ("Were the law otherwise, parents could endlessly parse IEPs into highly particularized components and circumvent the general rule that parents cannot unilaterally dictate the content of their. child's IEP.")

Here, as in Sneitzer, it might be the case that Plaintiff's ideal placement would involve getting to participate on the mountain biking team with a one-on-one aide physically fit enough to keep up with him. However, to determine whether the District satisfied its obligations under FAPE, this Court must decide whether the District's plan was appropriate, not ideal. And here, the evidence in the record demonstrates that the IEP was reasonably calculated to enable Plaintiff to garner educational benefits where it provided for a full-time one-on-one aide, weekly speech therapy classes, and weekly behavior intervention therapy, in conjunction with sensory strategies that addressed Plaintiff's physical and emotional needs.

Accordingly, the Court AFFIRMS the OAH decision in finding that FAPE does not require the provision of a competent mountain biking aide.

## B. Equal Opportunity

Plaintiff offers another avenue for finding that he requires a competent mountain biking aide: he argues that depriving him of a such an aide results in unlawful discrimination against him in violation of federal regulations promulgated pursuant to the IDEA. Appeal at 18. Specifically, Plaintiff relies on 34 C.F.R. §§ 300.107(a) and 300.117 as imposing requirements above the demands of FAPE.[10]

Section 300.107 provides that public agencies must take steps to provide nonacademic and extracurricular services and activities "in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities." In turn, Section 300.117 requires that disabled students can participate with nondisabled children in extracurricular services and activities "to the maximum extent appropriate to the needs of that child." Section 300.117 further required that public agencies ensure that every disabled child "has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings." These regulations were promulgated under the authority of 20 U.S.C. § 1412(a)(5), the provision of the

---

**10.** Defendant did not address this claim in its Opposition, but only asserted that Plaintiff waived his right to raise this issue on appeal since he never identified this claim at the administrative level. Opp'n at 12. As Plaintiff points out, and as the record reflects, Plaintiff raised claims under 300.107 both during the administrative hearing, and in his post-hearing brief. Appeal at 9; AR Vol. 2 at 363. Furthermore, as discussed later in this Opinion, it is unclear whether the OAH would even have the authority to adjudicate claims that are partially based in the Rehabilitation Act. Accordingly, the Court finds that Plaintiff did not waive this claim.

IDEA that requires disabled students to be educated with non-disabled children "to the maximum extent appropriate." Assistance to States For the Education of Children With Disabilities, 34 C.F.R. 7, 165 (July 9, 2009).

In support of his contention that these regulations require assignment of a qualified mountain biking aide, even if mountain biking is not required for his *education*, Plaintiff cites to Independent School District No. 12 v. Minnesota Dep't of Education, 788 N.W.2d 907 (Minn. 2010). In that case, the parents of a disabled child filed a complaint with the state Department of Education, arguing that the school should have included accommodations for extracurricular activities in the student's IEP. 788 N.W.2d at 908–11. The Minnesota Court of Appeals ruled that the IEP need only include such activities as are required for the child's education, but was overturned by Minnesota's Supreme Court, which determined that the plain language of Sections 300.107 and 300.117 does not limit extracurricular activities for inclusion in the IEP to those required to educate him. Id. at 914–15. In reaching its decision, the court noted, "Requiring disabled students to prove an educational benefit, when nondisabled students need not, does not afford disabled students an equal opportunity to participate in extracurricular and nonacademic activities." Id. at 915. This holding was reiterated in a case before the California OAH, where the ALJ held that while participation in after-school sports was not necessary for a disabled child to access his education (and therefore not necessary under FAPE), IDEA's implementing regulations obligated the District to provide him the opportunity to participate to the same extent as non-disabled students. Student v. Conejo Valley Unified School District, OAH Case No. N2005080442 (November 30, 2005).

At the August 29, 2016 hearing, the District's position was that, contrary to the decision of the Minnesota Supreme Court, the IEP team is not responsible for assessing or considering any extracurricular activities beyond what is necessary for the child's education. Accordingly, the District contends that it need not provide a mountain biking aide because Plaintiff's disability did not require it.

The Court is mindful that resolving this question—whether the District's IEP must include services so that Plaintiff can participate in an appropriate but educationally nonessential extracurricular activity to the same extent as his non-disabled peers— implicates difficult and largely unresolved questions of law. The plain language of the implementing regulations is, at first blush, in conflict with the Supreme Court's seminal interpretation of the obligations imposed by the IDEA in Rowley: there, the Supreme Court engaged in a searching review of the IDEA's legislative history and concluded:

> "[T]he requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children ... The educational opportunities provided by our public school systems undoubtedly differ from student to student, depending upon a myriad of factors that might affect a particular student's ability to assimilate information presented in the classroom. The requirement that States provide 'equal' educational opportunities would thus seem to present an entirely unworkable standard requiring impossible measurements and comparisons." 458 U.S. at 198–99, 102 S.Ct. 3034 (internal quotation marks omitted).

The implementing regulations at issue—which impose a requirement of equal opportunity—were promulgated in 1979, and therefore precede Rowley. See C.F.R. §§ 121a.306, § 121a.553 (1979).[11] It might seem, therefore, that Rowley invalidates the regulations insofar as they mandate "equal opportunity" for participation in extra-curricular activities. In fact, one circuit, at least, has already held so: in Rettig v. Kent City Sch. Dist., 788 F.2d 328, 331 (6th Cir. 1986), the Sixth Circuit held that a disabled student was not entitled to have the school district incorporate extracurricular activities into his IEP under the implementing regulations, because Rowley clarified that the IDEA "does not absolutely require that a handicapped child be provided each and every special service available to non-handicapped children." 788 F.2d at 332.

However, this Court is ultimately unwilling to find that Rowley—which never directly addressed the implementing regulations—nonetheless overruled them. First, the Court notes that the regulations are regularly updated, and, despite the fact that the regulations in question have undergone two revisions—first reissued as 31 C.F.R. 300.306 and 34 C.F.R. 300.553 in 1982, and then as 34 C.F.R. 300.107 and 34 C.F.R. 117 in 2006—the Secretary of Education, who promulgates the regulations, has not modified the language regarding the obligation to ensure an equal opportunity for disabled students in nonacademic settings post-Rowley.

Second, reading Rowley to reject equal opportunity considerations in all circumstances under the IDEA paints the decision with too broad a brush and ignores the effect of the Rehabilitation Act on the implementation of the IDEA. Section 504 of the Rehabilitation Act prohibits discrim-

ination on the basis of disability in programs or activities that receive federal financial assistance from the Department of Education, 29 U.S.C. § 794, and the IDEA's implementing regulations in question were originally created by reference to Section 504. See Comment to Assistance to States for Education of Handicapped Children ("ASEHC"), 45 Fed. Reg. 312, 358, 1979 ed. (October 1, 1979) (to be codified at 45 C.F.R. § 121a.553) ("Section 121a.553 [now Section 300.117] is taken from a new requirement in the final regulations for Section 504 of the Rehabilitation Act of 1973. With respect to this requirement, the analysis of the Section 504 Regulations includes the following statement: '... [H]andicapped children must also be provided nonacademic services in as integrated a setting as possible ... To the maximum extent appropriate, children in residential settings are also to be provided opportunities for participation with other children.'") Section 504 thus seems to impose additional requirements upon the proper administration of the IDEA to bring it into compliance with a broader congressional scheme to counteract disability discrimination. To the extent that Rowley delineated the scope of the IDEA, it could not undermine the application of the Rehabilitation Act's protection against disability discrimination to schools receiving federal financial assistance under the IDEA.

And, in fact, Rowley itself heavily qualified its rejection of "strict equality": the Supreme Court acknowledged the distinction between the right to equal *access* and "any notion of absolute equality ... regardless of capacity." 458 U.S. at 199, 102 S.Ct. 3034. Rowley rejected only the latter notion of equality as inherent in the IDEA, not the former. Id. at 199–200, 102 S.Ct.

---

11. These regulations previously appeared under a different heading and with a different

title, but the language remains virtually unchanged.

3034 (noting that equal protection under the Act likely does not require anything more than equal access). Rettig's later reading of Rowley's effect on the implementing regulations might be read to preserve this nuance: the Sixth Circuit's holding that the school district did not need to include five hours of extracurricular activities per week in the student's IEP rested in part of its finding that the extracurricular activities seemed inappropriate for the student given his "sporadic and recurring behavior, including regurgitation, lack of interest, self-stimulating activities and bladder accidents." 788 F.2d at 332. The decision can thus be read as finding that the extracurricular activities requested were not only unnecessary, but *inappropriate* to his needs. Under such circumstances, the Court agrees that the regulations—which, by their terms, require only the provision of extracurricular activities "to the maximum extent appropriate to the needs of that child"—would not apply.

Finally, Rowley concerned itself with the extent to which the concept of equality applied specifically to educational services, and *not* to extracurricular activities. The case concerned a dispute over whether a deaf student required the provision of a sign-language interpreter in her academic classes, and the Supreme Court was careful to limit its holding to those facts, noting that, "[b]ecause in this case we are presented with a handicapped child who is receiving substantial specialized instruction and related services, and who is performing above average in the regular classrooms of a public school system, we confine our analysis to that situation." 458 U.S. at 184–85, 202, 102 S.Ct. 3034. The Court thus refuses to extend Rowley to facts outside the scope of Rowley's express holding.

Furthermore, here, Plaintiff's argument is not that he should have access to the mountain biking team regardless of his capabilities—this would be the notion of "absolute equality" that Rowley rejected—but that mountain biking is "appropriate" to his needs. Pl. Supp. at 2. In this sense, the District's arguments at the August 29, 2016 hearing miss the point. The District asserted that the IDEA does not require absolute equality in the sense discussed by Rowley, arguing that equal does not mean identical, and that a child's disabilities could prevent him from ever accessing the same exact experiences as a non-disabled child. But this is not Plaintiff's demand, nor what the language of the regulations require.

▪ Rather, Section 300.117, by its terms, makes clear that a disabled child must be able participate "to the maximum extent appropriate to [his] needs." Accordingly, the Court agrees with the Minnesota Supreme Court that the regulations, while not requiring that every disabled child be allowed to participate in extracurricular activities *regardless* of his or her capabilities, nonetheless imposes an obligation to provide access above the bare requirements of FAPE under the IDEA. In fact, the Ninth Circuit has confirmed that the equal opportunity protection guaranteed by the Rehabilitation Act (and that informs the IDEA's regulations) may impose additional obligations based on a comparison between the manner in which needs of disabled and nondisabled children are met. See Mark H. v. Lemahieu, 513 F.3d 922, 933 (9th Cir. 2008) ("FAPE under the IDEA and FAPE as defined in the § 504 regulations are similar but not identical. When it promulgated its § 504 regulations, the U.S. DOE described them as '*generally* conform[ing] to the standards established for the education of handicapped persons in ... the [IDEA].' ")

By the plain terms of the regulation, access is not contingent on whether it con-

fers an educational or instructional benefit, as IDEA's FAPE requires, but only on whether the activity is appropriate for the student. And here, the evidence on the record, while insufficient to show that Plaintiff's IEP required a competent mountain biking aide for him to receive educational benefits, makes clear that participation on the team was *appropriate* for him. As discussed earlier in this Order, multiple witnesses at the hearing testified as to the positive effects of mountain biking on him, as well as his proficiency in it. Even the District conceded at the hearing that mountain biking could and would provide him some benefit.

Under Section 300.117, once an activity is deemed appropriate, the public agency "must ensure" that the student has the aids and services "appropriate and necessary" for the student to participate. The regulation does not itself contain any qualifiers that would limit the extent to which such services are provided by consideration of costs, and the Minnesota Supreme Court, at least, explicitly rejected such a defense by the school district. See Independent School District No. 12, 788 N.W.2d at 916, n.8 ("We are not unsympathetic to concerns of increased administrative and fiscal burdens on school districts. But the court may only consider the effects of a particular regulatory interpretation if the regulation is ambiguous. In this case, we hold that the regulation is unambiguous and interpret only its plain language. Thus we may not consider the budgetary effects ...") Furthermore, while Section 504, as well as the Americans with Disabilities Act, provide that a district need not provide a service if doing so would require a "fundamental alteration" to the program or impose a cost constituting an "undue burden," the Ninth Circuit has rejected the application of such defenses to the IDEA. See K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088,

1101 (9th Cir. 2013) ("The IDEA does not provide schools with any analog to Title II's fundamental alteration and undue burden defenses.")

■ The Court is reluctant to hold that the cost or difficulty of providing a service bears *no* relevance to the District's obligation to provide it, particularly in light of the fact that the implementing regulations themselves were originally promulgated by reference to the Rehabilitation Act—which *does* consider the burden to the school. See ASEHC, supra at 358. However, the Court need not decide this issue, as the District did not challenge that the cost was, as counsel for Plaintiff argued, de minimis. Neither did it suggest that it could not find an aide to keep up with Plaintiff; the undisputed testimony is that Plaintiff is "not an Olympic-grade biker." Appeal at 18, n.5. Furthermore, the evidence suggests that Plaintiff is asking only for an aide to accompany him for, at most, eight hours a week. Pl. Supp. at 3. Thus, Plaintiff's request does not appear to place an undue burden on the District, even assuming such a defense applies. See, e.g., U.S. Dep't of Educ., Office of Civil Rights, "Dear Colleague Letter" ("DCL") at 8 n.17 (Jan. 25, 2013) ("Although a school district may also raise the defense that a needed modification or aid or service would constitute an undue burden to its program, based on OCR's experience, such a defense would rarely, if ever, prevail in the context of extracurricular athletics ...")

Neither does it appear to require a "fundamental alteration" to the mountain biking program (again, assuming such a defense applies). The provision of an aide for Plaintiff so that he can apply to be on the team does not mean, as counsel for the District argued, that just anyone could walk on to team, regardless of their interest or capabilities. Rather, as Plaintiff's

counsel noted, an equal opportunity only guarantees that everyone can seek to *apply* for the team; participants must still be able to have a minimally sufficient speed and aptitude for the activity, but can't be denied that equal opportunity solely by reason of their disability. As the evidence indicates, Plaintiff has the skills and ability to participate, and providing him with an aide so that he has the opportunity to be on the team thus does not change the essential nature of the activity. See, e.g., DCL at 8 ("Because the school district always has a legal obligation under IDEA to provide aids or services in its education program to enable any IDEA-eligible students to participate in extracurricular activities, providing these aids or services after school to a student with a disability not eligible under the IDEA would rarely, if ever, be a fundamental alteration of its education program.")

Finally, the Court addresses the District's argument, raised during the August 29, 2016 hearing, that Plaintiff's claims are governed by the Rehabilitation Act and outside of the jurisdiction of the OAH. In support of this argument, counsel for the District pointed to the decision in Conejo, supra at 8, where the ALJ determined that, although the equal opportunity provisions in the Code of Federal Regulations obligated the district to provide the student with access to extracurricular activities beyond that necessary to satisfy FAPE, the OAH had no jurisdiction to resolve such disputes, since they involved provisions outside of FAPE. Conejo at 8–9. Regardless of the correctness of the ALJ's conclusion, this Court finds that there are no jurisdictional problems in adjudicating Plaintiff's claims of equal opportunity.[12] This is because if, as the ALJ concluded, the implementing regulations raise claims under the Rehabilitation Act and not under the IDEA, then *this* Court, if not the OAH, still retains jurisdiction over the claims. See, e.g., F.B. v. Sch. of Arts & Enter., No. CV 14-1878 DMG, 2014 WL 7525484, at *4–5 (C.D. Cal. Aug. 1, 2014) (allowing plaintiff to proceed with claims involving dispute over FAPE raised under Section 504 where she raised them directly before district court); see also Mark H. v. Lemahieu, 513 F.3d 922, 925 (9th Cir. 2008) (determining that Section 504 provides a private right of action enforceable in federal court).

On the other hand, if the regulations in fact raise claims under the IDEA, then Plaintiff is under an obligation to exhaust his administrative remedies before the OAH before he can proceed in this Court. See, e.g., M.M. v. Lafayette Sch. Dist., 767 F.3d 842, 861–62 (9th Cir. 2014), as amended (Oct. 1, 2014) (IDEA's exhaustion provision barred student from raising claims involving defects in IEP process); see also Marc M. ex rel. Aidan M. v. Dep't of Educ., Hawaii, 762 F.Supp.2d 1235, 1241

---

12. Given that the regulations were promulgated under the authority of the IDEA—and specifically under the provision delineating the requirements of FAPE—it is unclear whether the Conejo decision correctly declined jurisdiction over such claims. In particular, the ALJ cited to Education Code Section 56501, which allows the OAH to hold a hearing where "[t]here is a proposal [or refusal] to initiate or change the identification, assessment, or educational placement of the child or the provision of a free appropriate public education to the child." Cal. Educ. Code § 56501(a)(1–2). Because the ALJ determined that the federal regulations did *not* involve FAPE, he found that there was no jurisdictional hook for him to hear the claims. Conejo at 8–9. However, given that the Education Code refers back to the IDEA's language regarding FAPE, and that the regulations themselves ostensibly elaborate on the "least restrictive means" requirement of FAPE, it would seem that the jurisdictional grant to the OAH could potentially cover the adjudication of such disputes. In any case, the Court need not decide this question in this Appeal.

(D. Haw. 2011) ("[W]hen a plaintiff has alleged injuries that could be redressed to any degree by the IDEA'S administrative procedures and remedies, exhaustion of those remedies is required."). Of course, as Plaintiff notes, he did so: he raised these claims both during the hearing and in his post-hearing brief. Appeal at 9; AR Vol. 2 at 363. As a result, the Court finds that the question of whether Plaintiff is entitled to a competent mountain biking aide under Sections 300.107 and 300.117 is properly before the Court.

Accordingly, because the evidence on the record indicates that mountain biking is an appropriate activity for Plaintiff and because the provision of an aide does not impose unreasonable demands on the District, the Court finds that Plaintiff is entitled to the provision of a competent mountain biking aide so that he may apply to participate in the school's mountain biking team as a non-competing team member. This is necessary to fulfill the District's obligation to ensure that he has the services necessary to participate in extracurricular activities to the maximum extent appropriate to his needs.

## IV. CONCLUSION

For the reasons stated above, the Court REVERSES the decision of the OAH as to the provision of a male one-to-one aide and AFFIRMS the decision as to the provision of a competent mountain biking aide under FAPE. However, as discussed, the Court finds that the IDEA's implementing regulations require the provision of such an aide to fulfill the District's obligations to ensure Plaintiff's equal access to extracurricular activities. Accordingly, the Court ORDERS the District to incorporate the provision of a male one-to-one aide into Plaintiff's IEP and make arrangements to provide Plaintiff with a competent mountain biking aide.

**IT IS SO ORDERED.**